# Richmond

AETNA CASUALTY AND SURETY COMPANY OF HARTFORD, CONNECTICUT V. BOARD OF SUPERVISORS OF WARREN COUNTY, NATIONAL SURETY COMPANY OF NEW YORK, ET ALS.

March 30, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

14

20

24

The opinion states the case.

*W. Braxton Dew,* for the appellant.

*John H. Downing, Harrison & Harrison, Harry R. Kern, Joseph F. Moore, Walter G. Olmstead, R. Gray Williams, Weaver & Armstrong* and *E. H. Jackson,* for the appellees.

EPES, J., delivered the opinion of the court.

A. L. Warthen served continuously as treasurer of Warren county from November 3, 1915, to his death on November 9, 1928. At the time of his death he was insolvent and was heavily indebted, as treasurer, to the Commonwealth of Virginia, to Warren county and to the county school board; but there is no evidence which tends to show that any part of this indebtedness arose prior to January 1, 1920.

When Warthen qualified for the four-year term beginning January 1, 1920, he gave bond in the penalty of $60,000, with ten persons as his surety. When he qualified for the four-year term beginning January 1, 1924, he gave bond in the penalty of $43,000, with The Aetna Casualty and Surety Company as his surety. Upon his qualification for the four-year term beginning January 1, 1928, he gave bond in the penalty of $60,000 with the National Surety Company as surety. Each of these three bonds is conditioned for the faithful discharge of his office or trust as treasurer of Warren county.

In September, 1927, The Aetna Casualty and Surety Company instituted proceedings under section 5771, Code of Virginia 1919, to require Warthen to give a new bond, and thereby relieve it from future liability as his surety. Though Warthen did not give a new bond, the court entered an order on October 13, 1927, adjudging that The Aetna Casualty and Surety Company be and was relieved from future liability as surety on Warthen's official bond after noon of that day, but did not remove him from office. On October

24, 1927, however, it entered an order removing Warthen from office for failure to give a new bond as treasurer in the penalty of $60,000, as had been required by the court in a second order entered by the court on October 13. Warthen moved the court to suspend the order of removal of October 24 to permit him to apply for a writ of error; and on October 31 the court suspended the order of removal[1] upon his giving a suspending bond, dated October 31, 1927, in the penalty of $63,000, with forty-six persons as his sureties. Warthen applied for and was granted a writ of error and supersedeas, and on November 19, 1927, gave a supersedeas bond in the penalty of $63,000, with thirty-eight persons as his sureties. On September 12, 1928, this writ of error and supersedeas was "dismissed agreed."

After Warthen's death the "board of supervisors of Warren county and S. B. Downing, treasurer of Warren county, at the relation of the board of supervisors of Warren county and the county school board of Warren county" instituted this suit against the administrators and heirs of A. L. Warthen and the sureties on the five bonds above mentioned. In addition to the parties above mentioned, the bill also made parties defendant the sureties on the official bond given by Warthen for his four-year term of office beginning January 1, 1916. On September 16, 1926, certain persons had entered into an agreement with Aetna Casualty and Surety Company to indemnify it against all liability which it might incur on or after that date as surety on Warthen's bond; and in its answer and cross-bill Aetna Casualty and Surety Company made these persons parties defendant.

The purposes of the bill are (1) to have the court determine the amount due by Warthen, as treasurer, to the Commonwealth of Virginia, (2) to procure an adjudication as to the portions of such indebtedness for which the sureties on his several bonds are liable, respectively, and

---

[1] The only orders suspended by the trial court were the order of October 24, 1927, removing Warthen from office, and the order of October 31, 1927, overruling his motion to set aside the order of October 24.

(3) to recover from the sureties on his several bonds the amounts for which they, respectively, are liable to Warren county and the county school board of Warren county.

It is, in effect, admitted that at his death Warthen, as treasurer, was indebted to the Commonwealth in the sum of $2,424.74, and to Warren county in the sum of $81,142.12 (which includes the amount due by him to the county school board) ; and that for his indebtedness to the Commonwealth the National Surety Company is alone of the sureties on his bonds liable.

In so far as the decree of the court relates to Warthen's indebtedness to the Commonwealth and to the liability of the National Surety Company therefor, it is not appealed from, and may be dismissed from our attention. The real questions in issue relate to the respective liabilities of the sureties on his several bonds to the county and the county school board.

It is not necessary here to relate in detail the pleadings filed in the trial court or here, further than to say that they are sufficient to raise all the questions herein considered.

The cause was referred to a commissioner in chancery who, in due course, made his report. The court confirmed this report in part, but in many of the most essential particulars overruled it, and entered a decree which was, in effect, as follows:

(1) It is not proven that any part of Warthen's defalcations occurred prior to January 1, 1924; and the sureties on Warthen's official bond for the term beginning January 1, 1920, are not liable for any part of his indebtedness.

(2) The defalcations occurring from January 1, 1920, to and including October 13, 1927, amounted to $53,833.74; and The Aetna Casualty and Surety Company is liable to Warren county for these defalcations to the full amount of the penalty of its bond ($43,000), with interest thereon from *October 13, 1927*.

(3) The Aetna Casualty and Surety Company was relieved by the order of October 13, 1927, of the liability for

defalcations or indebtedness of Warthen occurring after noon on October 13, 1927; and it is not liable for any defalcations occurring after that date. There is no liability on the sureties on the suspending bond.

(4) No defalcations occurred between October 13 and November 19, 1927; but defalcations to the amount of $5,-581.89 occurred between the execution of the supersedeas bond on November 19, 1927, and January 1, 1928, for which amount, with interest from January 1, 1928, the sureties on the supersedeas bond are liable to Warren county; but they are not responsible for the defalcations of Warthen made prior to October 13, 1927.

(5) Defalcations to the amount of $22,126.51[2] occurred after January 1, 1928, for which amount, with interest from November 13, 1928, the National Surety Company is liable to account to Warren county.

(6) The Aetna Casualty and Surety Company paid to Warren county on February 18, 1931, $17,121.74 on account of its liability as surety on Warthen's bond, and the balance due by it is $35,302.26, with interest from *February 18, 1931.*

(7) Since Warthen's death a net amount of $2,286.41 has been collected on tax tickets for years prior to 1927 which were in his hands at the time of his death, and a net amount of $4,096.16 has been collected on tax tickets for the year 1927 which were in his hands at the time of his death, which sums were paid over to S. B. Downing, treasurer of Warren county, on April 22, 1930. The sum of $2,286.41 is to be applied to that part of Warthen's indebtedness which arose prior to October 13, 1927, which is not recoverable under the bond of The Aetna Casualty and

---

[2] This amount is arrived at by adding $5,581.89 to $53,833.74 and deducting this sum from $81,542.14. The court has apparently overlooked the two credits of $200 each for which the commissioner reported that Warthen was entitled to credit, to which part of the report no exception was taken. These credits reduce Warthen's total indebtedness to Warren county to $81,142.12, and are clearly items which are properly credited against that part of his indebtedness which accrued after January 1, 1928.

Surety Company. The sum of $4,096.16 is to be applied pro rata to the reduction of the indebtedness for which the sureties on the supersedeas bond and the National Surety Company are liable—$835.24—to the amount for which the sureties in the supersedeas bond are liable, and $3,260.94 to the amount for which the National Surety Company is liable.

(8) The sum for which the sureties on the supersedeas bond are liable is $5,581.80 with interest from January 1, 1928, subject to a credit of $835.24 as of April 22, 1930.

(9) The total amount of the defalcations of Warthen for which National Surety Company is liable to Warren county is $22,126.51 with interest from November 13, 1928, on which it is entitled to a credit as of April 22, 1930, of $3,260.94. National Surety Company paid to Warren county on February 18, 1931, $23,991.90, which has resulted in an overpayment of its liability by National Surety Company to the amount of $2,352.83, which amount it is entitled to be reimbursed by Warren county.

(10) The cross-bill of Aetna Casualty and Surety Company is dismissed against the indemnitors of that company as surety on Warthen's official bond for the term beginning January 1, 1924.

(11) The bill is dismissed as to the sureties on Warthen's official bonds for the terms beginning January 1, 1916, and January 1, 1920.

The decree also makes a number of specific rulings upon which its final determinations above mentioned are based, and in so far as may be necessary these will be mentioned later.

From this decree an appeal has been allowed to Aetna Casualty and Surety Company; and both the complainants below and the sureties on the supersedeas bond have assigned cross-error. We shall not here set out the several assignments of error and cross-error, but shall refer to them as we take up the consideration of the several questions which they raise.

It will tend to clarity of treatment to dispose at this time of several questions which arise as to the effect of the orders entered and bonds given in the proceedings had in 1927 relative to the release of Aetna Casualty and Surety Company from liability on Warthen's official bond and the removal of him from office; and we shall consider these questions before taking up the other questions raised by the several assignments of error and cross-error. To do this with clarity it will be necessary to restate more fully some of the facts to which we have made reference above.

Prior to September 12, 1927, Aetna Casualty and Surety Company filed a petition in the Circuit Court of Warren county, in which it prayed that Warthen be required to relieve it from further liability as surety on his official bond by giving a new bond, and that if he failed to give a new bond that he be removed from office. Warthen requested Aetna Casualty and Surety Company to dismiss this petition, and in a writing dated September 12, 1928, requesting the dismissal of this petition, he agreed as follows: "It is distinctly understood that this petition is dismissed without prejudice and may be reinstated and filed again at any time that the Aetna sees fit upon giving me seven days' notice and I hereby agree that seven days shall be deemed a reasonable notice." Pursuant to this request the petition was dismissed.

The State Accountant made an audit of Warthen's accounts as treasurer as of September 8, 1927; and on September 12, 1927, addressed a letter to the board of supervisors of Warren county in which he reported what this audit showed. This report was that Warthen was indebted to the county in the sum of $55,601.84, which amount, however, was subject to a credit for such 1926 tax tickets as should thereafter be allowed to him as delinquent taxes; that at this time the delinquent list for 1926 had not been presented for allowance by Warthen to the proper authorities, but the tax tickets for which he claimed allowance amounted to $375.30, and that the amount on deposit

in bank to Warthen's order as treasurer was $10,895.44. In short, that he owed the county $44,331.40 more than he had on hand or on deposit in bank to his order as treasurer.

After this report had been made, The Aetna Casualty and Surety Company again filed its petition in the Circuit Court of Warren county in accordance with section 5771, Code of Virginia 1919. This petition stated that the petitioner desired to be relieved from future liability on Warthen's official bond; and prayed "that an order be entered requiring the said Arthur L. Warthen immediately to give a new bond securing the remainder of his said term of office as treasurer of Warren county, Virginia, and upon his failure so to do, that he shall forthwith be removed from his said office; that if a new bond is given by the said Arthur L. Warthen within the time required by the court, an order may be entered relieving your petitioner from all liability which may thereafter accrue upon its said bond now outstanding." The petitioner gave notice to Warthen that it would on October 1, 1927, file this petition in the Circuit Court of Warren county, which notice was served on Warthen in person on September 23, 1927.

The petition came on to be heard on October 1, 1927, on which day the following report was made to the judge of the circuit court by the board of supervisors of Warren county:

REPORT OF BOARD OF SUPERVISORS TO JUDGE OF
THE CIRCUIT COURT OF WARREN COUNTY.

"FRONT ROYAL, VA., October 1, 1927.

"To the HON. PHILIP WILLIAMS:
"Judge of the Circuit Court of Warren county, Va.

"The board of supervisors of Warren county, Virginia, beg leave to report that they have had a settlement with the treasurer of Warren county, Virginia, Mr. A. L. Warthen, as directed by section 2719 of the Code of Virginia,

and in conformity with the directions contains in your letter of September 20, 1927, directed to the chairman of our board.

"We have examined the audit of State Accountant, W. F. Smyth, dated September 12, 1927, which audit covers the period from November 25, 1926, to September 8, 1927, and find the same correct and formally adopt it as our *reprt*, which shows that A. L. Warthen, treasurer, is indebted to the county of Warren, Virginia, as of September 8, 1927, in the sum of $55,601.84.

"We desire to credit the treasurer's account with the following items, which have been *alowed* or paid by him between the 8th day of September, 1927, and October 1st, 1927: [Those items aggregate $4,015.15.]

\* \* \* \* \* \* \*

"The treasurer presented delinquent capitation and personal property tax tickets, amounting to $2,102.74, for which he claims credit. Of this amount the Auditor allowed credit for $375.30, leaving a net credit of $1,727.44, as above allowed, which item is subject to final action thereon required by law.

"The board of supervisors therefore reports that A. L. Warthen, treasurer of Warren county, Virginia, is indebted to said county in the sum of $51,586.69.

"We requested to be informed as to what amount, if any, was on deposit in any bank, to the credit of the treasurer of Warren county, but were not informed as to this.

"There was exhibited to us cash in the treasurer's office, amounting to $1,002.00, by Francis C. Jones, clerk, which amount he is entitled to credit against the audit balance shown above.

"Respectfully submitted,

"JNO. M. LAKE, *Chairman,*

"G. CATLETT,

"L. H. FRISTOE,

"JOHN B. EARLE,

"Board of Supervisors of Warren county, Va.

"The board requested the delivery of the $5,000.00 road bond, which was reported to have been paid by the treasurer, for cancellation; the same having been promised to be produced today, but the treasurer not being present at today's meeting, and the clerk being asked about the bond, stated that he knew nothing about it.

"A Copy, Teste: MARVIN A. TROUT, Clerk."

Upon the hearing on October 1, the court entered the following order, which was duly served upon Warthen on that day:

"AETNA CASUALTY AND SURETY COMPANY,
 "vs.
"ARTHUR L. WARTHEN

"This cause came on this first day of October, 1927, to be heard upon the petition of The Aetna Casualty and Surety Company, to be relieved from suretyship on the official bond of Arthur L. Warthen, treasurer of Warren county, pursuant to notice duly served upon the said Arthur L. Warthen:

"Thereupon, the said petitioner, by counsel, moved the court to grant the prayer of the said petition forthwith, and the said A. L. Warthen, appearing by his son, Gibson R. Warthen, requested that he be given thirty days time in which to execute a new bond.

"The petitioner suggested that it would consent to the entry of an order on the 13th day of October, 1927, to relieve its suretyship on the said bond of Arthur L. Warthen, from that date and that the time should be extended to said Arthur L. Warthen until said date to give a new bond.

"The court being of the opinion that the penalty of the said bond required of Arthur L. Warthen, as treasurer of Warren county, should be fixed at sixty thousand dollars ($60,000.00) in order to comply with the statute requiring the penalty of the treasurer's bond to be not less than fifty per centum of the amount to be received by him annually.

"Upon consideration of all of which, and it appearing to the satisfaction of the court, that reasonable notice of the intended motion of The Aetna Casualty and Surety Company to be relieved from suretyship on the bond of A. L. Warthen, has been given the said Arthur L. Warthen;

"It is ordered, adjudged and decreed that the said Arthur L. Warthen shall, not later than the hour of twelve o'clock, noon, on the 13th day of October, 1927, give a bond in the penalty of sixty thousand dollars ($60,000.00), in the form and with surety satisfactory to this court, for the faithful discharge of his duties as treasurer of Warren county; or upon default thereof that he shall be forthwith removed from his office as treasurer of Warren county, as required by the statute in such cases made and provided.

"The motion of the petitioner to be relieved of its suretyship, as prayed for in said petition, shall be continued until the 13th day of October, 1927, at which time an order shall be entered to relieve it from suretyship on the bond of Arthur L. Warthen, as prayed for in said petition.

"It is ordered that copies of this order shall be forthwith served upon the said Arthur L. Warthen and upon the board of supervisors of Warren county, Virginia."

On October 13th, Warthen failed to give the new bond required of him by the order of October 1, 1927; and thereupon the court entered the two orders below quoted, which, in effect, constituted one order, and were duly served upon Warthen on October 13th.

ORDER OF OCTOBER 13, 1927, RELIEVING THE AETNA CASUALTY AND SURETY COMPANY AS SURETY.

"THE AETNA CASUALTY AND SURETY COMPANY
 "vs.
"ARTHUR L. WARTHEN

"This cause came on this 13th day of October, 1927, to be heard upon the petition of The Aetna Casualty and Surety Company to be relieved from suretyship on the official bond of Arthur L. Warthen as treasurer of Warren county.

"It appearing that by an order entered in this cause on the 1st day of October, 1927, of the entry of which order the said Arthur L. Warthen had notice both from his appearance in court when the same was entered and by service of a copy of the order upon him, it was provided that this court would this day enter an order to relieve said surety, and the said Arthur L. Warthen was given until the hour of twelve o'clock noon of this day to enter into a new bond.

"It further appearing that proper notice of this pendency of the said petition was served upon the said Arthur L. Warthen.

"It is ordered, adjudged, and decreed that The Aetna Casualty and Surety Company be, and it hereby is, relieved from *suretyship* on the official bond of the said Arthur L. Warthen as treasurer of Warren county, Virginia, from and after the entry of this order; but this order shall not relieve said surety from liability for any breach of said bond which may have taken place prior to the hour of twelve o'clock, noon, of the 13th day of October, 1927, and its full liability as surety on the said bond to the hour and date specified shall be in no way affected by this order.

"It is further ordered that this order is entered and shall be effective at twelve o'clock, noon, this the 13th day of October, A. D., 1927."

ORDER OF OCTOBER 13, 1927, REQUIRING A. L. WARTHEN TO GIVE BOND AS TREASURER OF WARREN COUNTY

"It appearing that The Aetna Casualty and Surety Company has by order this day entered been relieved from suretyship on the official bond of A. L. Warthen, treasurer of Warren county; and that by order of this court the said A. L. Warthen was required to give a new bond this day in the penalty of sixty thousand dollars; but the said A. L. Warthen now appearing in open court, by counsel,

and requesting an extension of ten days time within which to give said required bond;

"It is ordered that the said A. L. Warthen shall not later than eleven o'clock, A. M., on the 13th day of October, 1927, give bond, in form and security satisfactory to this court, in the penalty of sixty thousand dollars for the faithful performance of the duties of the office of treasurer of Warren county, and that upon his failure so to do, he shall be forthwith removed from office.

"It is further ordered that the said A. L. Warthen shall this day file with the clerk of this court a statement in writing showing all moneys on deposit in bank and in his possession by virtue of his office as treasurer of Warren county, and that during the period from the entry of this order until the date when he is required to give bond, as herein provided, that he shall file with the clerk of this court each day a statement showing all moneys received and disbursed as treasurer of Warren county.

"It is further ordered that the said A. L. Warthen shall not receive the tax tickets for taxes and levies for the current fiscal year and that he shall not receive any payment for such taxes and levies until he shall have given the bond required by this order.

"It is ordered that a copy of this order be served upon the said A. L. Warthen forthwith."

On October 24th, Warthen failed to give the bond required by the orders of October 1st and 13th, and the court entered the following order which was duly served on Warthen, on the chairman of the board of supervisors, and the superintendent of schools, and a copy thereof mailed to the Auditor of Public Accounts and the State Accountant."

ORDER OF OCTOBER 24, 1927, REMOVING WARTHEN FROM OFFICE.

"This matter came on in the Circuit Court of Warren county, this 24th day of October, 1927, pursuant to the

order entered by this court on the 13th day of October, 1927, which required Arthur L. Warthen to give bond in the penalty of sixty thousand dollars for the faithful performance of his duties as treasurer of Warren county, not later than the hour of eleven o'clock, A. M., on the 24th day of October, 1927.

"The said Arthur L. Warthen, now appearing in open court, by counsel, and requesting that further time be given him within which to comply with said order, the court deems it proper to set forth the circumstances which impel it, in the exercise of the discretion with which it is vested, to deny this request for further time.

"As required by statute, the State Accountant, under date of September 15, 1927, notified the judge of this court to the effect that by audit of the accounts of Arthur L. Warthen, treasurer of Warren county, made to September 8, 1927, the balance due the several accounts in the said treasurer's office amounted to the sum of $44,331.10.

"On October 1, 1927, the board of supervisors of Warren county made a report in writing to the judge of this court, to the effect that the balance due from Arthur L. Warthen, treasurer of Warren county, to the several accounts in his office, amounted to the sum of $51,586.69; and they further reported to the effect that they had requested to be informed as to what amount, if any, was on deposit in any bank to the credit of the treasurer of Warren county, but were not informed as to this; and that there was exhibited to them in cash in the treasurer's office a sum amounting to $1,002.00 by Francis C. Jones, clerk, which amount should be credited against the audit balance shown by their report.

"On October 1, 1927, the judge of this court and the Commonwealth's attorney of Warren county, acting under authority of section 2201 of the Code of Virginia, requested in the treasurer's office of Warren county, the exhibit of the cash to balance the accounts of the treasurer. In response to this request the clerk in charge of the said office ex-

hibited the sum of $823.81 in cash, and county warrants aggregating the additional sum of $178.19, which, it was stated, had that day been paid. The treasurer had been informed by letter from the judge of this court under date of September 26, 1927, that he would be expected to comply with the statute referred to, on October 1, 1927, but he was not present in his office.

"On October 1, 1927, pursuant to proper notice duly served upon Arthur L. Warthen, The Aetna Casualty and Surety Company, surety on the official bond of the treasurer of Warren county, petitioned this court to be relieved from suretyship on the said bond.

"Arthur L. Warthen appearing by his son, requested in open court thirty days time within which to give a new bond. The petitioner consenting, order·was entered continuing the motion until October 13, 1927, and requiring Arthur L. Warthen to give bond in the penalty of sixty thousand dollars for the faithful discharge of his duties as treasurer of Warren county, by not later than the hour of twelve o'clock, noon, on the 13th day of October, 1927. The penalty of the bond then in force, which had been fixed at the beginning of his term of office, was in the sun of forty-three thousand dollars.

"This order recited that the penalty of the bond, in the opinon of the court, should be fixed at sixty thousand dollars, in order to comply with the statute requiring the penalty of the treasurer's bond to be not less than fifty per centum of the amount to be received by him annually.

"On October 13, 1927, this court entered an order relieving The Aetna Casualty and Surety Company from suretyship on the official bond of A. L. Warthen, treasurer of Warren county. On the same day, Arthur L. Warthen appeared by counsel in open court and requested ten days time in which to give the bond required of him by the court; and thereupon the court entered an order requiring that Arthur L. Warthen should, not later than eleven o'clock, a. m., on the 24th day of October, 1927, give bond,

in form and security satisfactory to the court, in the penalty of sisty thousand dollars for the faithful performance of the duties of the office of treasurer of Warren county; and that upon his failure so to do, he should be forthwith removed from office.

"It now appearing to the court that the said Arthur L. Warthen has failed to give bond for the faithful performance of the duties of his office as treasurer of Warren county, as he was required to do by the order of the court entered on October 13, 1927;

"It is therefore ordered and adjudged, in accordance with section 5773 of the Code of Virginia, that the said Arthur L. Warthen is guilty of a breach of duty for failure to give bond as required by the former order of this court, and he is hereby forthwith removed from office as treasurer of Warren county; and the said office is hereby declared to be vacant.

"It is further ordered that, in compliance with section 2786 of the Code of Virginia, the said Arthur L. Warthen shall immediately make settlement with the board of supervisors of Warren county, of his accounts as treasurer of said county, showing the amount in his hands to be accounted for, and the fund to which the same belongs; and he shall deliver to his successor in office, upon the appointment and qualification of such successor, all bonds, books, and papers belonging to his office, and all money belonging to the county of Warren; and all other property, records, and money which he holds by virtue of his office as treasurer of Warren county.

"It is further ordered that, as required by section 2779 of the Code of Virginia, the said Arthur L. Warthen shall deliver to his said successor in office all tax tickets for taxes and levies for the current fiscal year, for which he has not accounted and paid into the treasury, taking the receipt of his said successor for same.

"It is ordered that copies of this order shall be forthwith served upon the said Arthur L. Warthen, and upon the

board of supervisors of Warren county, and upon the division superintendent of schools for Warren county; and that copied thereof shall be forthwith transmitted to the Auditor of Public Accounts, and to the State Accountant of the State of Virginia."

In a second order entered on October 24th, the court recited that the court had not determined whom it would appoint to fill the vacancy in the office of treasurer, and ordered Warthen to deliver to the clerk of the court[3] "all of the bonds, books, papers, money, property, records and tax tickets which the said Arthur L. Warthen was by the former order of this court this day made, required to deliver to his successor in office."

On October 25th, Warthen moved the court to set aside the order of October 13th relieving The Aetna Casualty and Surety Company as surety on his bond. This motion the court overruled by its order of that date. Warthen then moved the court to set aside its order of October 24th removing him from office and to permit him to give bond with the National Surety Company as his surety, but with the proviso that the bond should contain certain reservations as to the surety's liability. This motion the court also overruled by its order of that date.

On October 31st Warthen again moved the court to set aside "The order entered by the court on the 24th day of October, 1927," and offered to give the bond required by that order with the National Surety Company as surety. This motion the court overruled. Warthen then signified his intention to apply for a writ of· error and supersedeas "to this order [*i. e.,* the order of October 31st] and the order of October 24, 1927, and the *order* of October 13, 1927," and moved the court to suspend "its judgment in the various orders." Thereupon the court suspended for twenty days *"this order and the order of October 24, 1927,"* upon condition that a suspending bond be given by Warthen in the penalty of $63,000 "conditioned as the law directs;" and

---

[3] See Tax Code of Va. (Acts 1928, p. 35, ch. 45), section 353.

accepted a suspending bond in the penalty of $63,000, conditioned in accordance with section 6338, Code of Virginia 1919. This bond, which is dated October 31, 1927, is executed by Warthen, as principal, and by forty-six persons as sureties.

Within the twenty-day suspension period, Warthen filed a petition for a writ of error and supersedeas to the order of October 13th relieving The Aetna Casualty and Surety Company as surety on his bond and also to the orders of October 24th, 25th and 31st relating to his removal from office. A writ of error and supersedeas was allowed him by one of the judges of the Supreme Court of Appeals on October 17, 1927, the amount of the penalty of the bond being fixed at $63,000; and on November 19, 1927, Warthen executed a supersedeas bond in the penalty of $63,000, conditioned as required by section 6351, Code of Virginia 1919, with thirty-eight persons (the limit of each of whose liability is specifically set forth in the bond) as sureties.

On September 12, 1928, the Supreme Court of Appeals entered its order dismissing the writ of error and supersedeas. This order reads:

"Arthur L. Warthen * * * Plaintiff-in-Error *vs.* The Aetna Casualty and Surety Company and the Commonwealth of Virginia * * * Defendants-in-Error.

"Upon a writ of error and supersedeas to orders and judgments of the Circuit Court of Warren county entered on October 13th, October 24th, October 25th, and October 31, 1927. This day came the parties by counsel, and on motion of the plaintiff-in-error, it is ordered that this cause be dismissed agreed."

The first question presented by the proceedings had, orders entered, and bonds executed in 1927, is this: Were the orders of October 13th relieving Aetna Casualty and Surety Company from its suretyship and the order of October 24th removing him from office void orders, or were they at most merely errroneous orders and of binding effect until reversed?

The proceeding which resulted in the entry of the foregoing orders was begun as a proceeding under section 5771 and section 5773, Code of Virginia 1919; but with the filing of the report made by the board of supervisors to the judge of the court on October 1, 1927, it developed into a double barreled proceeding under those sections and section 280. The material parts of sections 5771, 5773, 280, and 281, in connection with which they are to be read and applied, are quoted in the footnote.[4]

■■ Courts have no general common-law or statutory jurisdiction to relieve sureties from their liability on official bonds or to require officers to give new or additional bonds. Such jurisdiction as they have in these particulars is a special statutory jurisdiction. An examination of sections 5771, 5773, and 280, in connection with section 281, makes it plain that these sections do not confer upon the court power to relieve sureties on official bonds from liability thereon. They merely empower the court to enter an order requiring an officer to give a new bond, and, if he fails to comply with such order, to remove him from office. Such orders may result in relieving the surety, in whole or in part, from future liability on the official bond of the officer; but the court has no inherent power to *grant* the surety relief from his suretyship. The only relief the

---

[4] Section 5771.—"How sureties on official bonds relieved.—When the surety * * * of any officer * * * required to give bond, shall petition the court by which the bond is taken, or in which, or in the clerk's office of which, it is recorded, * * * to be relieved from the suretyship, such court shall, on proof of reasonable notice of his intended motion, require such officer * * * to give a new bond in the same manner as if none had been given by him: * * *."

Section 5773.—"If any such officer, * * * being so required, fail to give such new bond within the time required by the court, he shall be deemed to be guilty of a breach of duty, and shall be forthwith removed from his office or trust; * * *."

Section 280.—"The proper court, whenever, in its opinion, it may be necessary for the protection of the public interest, may order any officer, of whom a bond is required by law, to give a new bond, or a bond in addition to one already given, within such time, not less than ten nor more than thirty days, as the court may prescribe; but the officer shall be served with a copy of a summons or rule, at least ten days before the order is made, citing him to appear and show cause

surety can procure, by court order or otherwise, is such as follows as a legal consequence from the giving by the officer of a new bond or from his removal from office.

If the court, in pursuance of either section 5771 or section 280, orders the officer to give a new bond, and it is given and accepted, then by virtue of section 281 the sureties on his former bond are relieved of all future liability thereon; but the court is not empowered to enter any order which will relieve the sureties on the existing bond from future liability thereon until and unless a new bond is given and accepted.

If the officer fails to give a new bond as ordered, the court is empowered and required forthwith to remove him from office. Removal from office relieves the sureties on the bond of the officer from liability for any future acts done by the officer in his official capacity, because it terminates his official status; but it leaves the sureties liable for any subsequent misappropriation of property or funds which were in the hands of the officer at the time of his removal.

In so far as the order of October 13, 1927, purported to relieve The Aetna Casualty and Surety Company of future liability on the official bond of Warthen before a new bond was given and accepted, it was an order which

against the same. The summons or rule shall be awarded whenever the court deems it proper, or on application to the court by the attorney for the Commonwealth. * * * If any officer fail or refuse to give the bond so required of him within the time prescribed, his office shall be deemed vacant."

Section 281.—"Where it is provided by any section of this Code, or shall be provided by any subsequent statute, that any new bond, or bond in addition to one already given, may be required to be given by any officer * * *, if such new bond, when required, be given and accepted, the sureties in the former bond and their estates shall, except in cases where it is otherwise expressly provided, be discharged from all liability for any breach of duty committed by their principal after such new bond is so given and accepted. If such additional bond, when required, be given and accepted, the former bond shall continue in force and have the same effect in all respects as if such additional bond had not been required, given, and accepted; except that in such case the sureties in the additional bond shall be jointly liable with the sureties in the former bond for any breach of duty committed by their principal after such additional bond was so given and accepted."

the court was without power or jurisdiction to enter under any circumstances, was void on its face, and ineffective for any purpose whatever. Where the court, as here, is exercising special statutory powers, the measure of its authority is the statute itself; and a judgment or order in excess of the powers thereby conferred is null and void. In such a case, even though the court may have jurisdiction of the general subject matter and of the parties, an adjudication with reference thereto which is not within the powers granted to it is *coram non judice.* Freeman on Judgments (5th ed.) section 354; Black on Judgments (2d ed.) section 242, also section 171 and section 215; 33 C. J. p. 1076; *Wade* v. *Hancock,* 76 Va. 620, 624-626; *Anthony* v. *Kasey,* 83 Va. 338, 5 S. E. 176, 5 Am. St. Rep. 277; *Barnes* v. *American Fert. Co.,* 144 Va. 692, 707, 130 S. E. 902; *Bigelow* v. *Forrest,* 9 Wall. 339, 19 L. Ed. 696; *Armstrong* v. *Obucino,* 300 Ill. 140, 133 N. E. 58; *Armour Grain Co.* v. *Pittsburgh, C., C. & St. L. R. Co.,* 320 Ill. 156, 150 N. E. 650; *Steenrod* v. *L. M. Gross Co.,* 334 Ill. 362, 166 N. E. 82; *Wright* v. *Atwood,* 33 Idaho 455, 195 Pac. 625; *State* v. *District Court of Eighth Jud. Dist.,* 33 Wyo. 281, 238 Pac. 545; *Title Guaranty & Surety Co.* v. *Foster,* 84 Okla. 291, 203 Pac. 231. The last case cited was a case in which a surety sought relief from its suretyship under a statute very similar to section 5771, and is directly in point.

On the other hand, the order of October 24, 1927, removing Warthen from office, was an order which the court, under the special powers conferred upon it by the statutes above quoted, had the power to enter; and, if it was erroneous, it was a binding effectual judgment of the court until reversed. *Wade* v. *Hancock,* 76 Va. 620, 626.

The second question presented by the orders entered in October, 1927, and upon the writ of error thereto, is this: What effect did the dismissal of the writ of error and supersedeas have upon the orders of October 13th and of October 24, 1927?

Section 6356 provides that except where the dismissal was for failure to pay writ tax, "After the dismission of an appeal, writ of error, or supersedeas, no other appeal, writ of error, or supersedeas shall be allowed to or from the same judgment, decree, or order." This court has said in several cases that, by virtue of this section, the dismissal of a writ of error or appeal has the effect of affirming the judgment or decree appealed from;[5] but what is said in those cases must be construed in the light of the facts of those cases and the issue therein decided. While the dismissal of a writ of error is in a sense an affirmance of the judgment appealed from, it is an affirmance in a limited sense only.

Where the judgment appealed from is *absolutely void upon its face* because the court is without power to enter such a judgment in any event, and the writ of error is dismissed upon a ground which does not in any way bring into issue or involve the question whether it is void or not, the dismissal does not impart to the judgment any validity which it would not have had if there had been no appeal. It relieves the judgment from attack for error or irregularity which can be taken advantage of only upon an appeal or by some other direct proceeding to review the judgment of the trial court, but it does not operate to make the void judgment binding as an actual affirmance of the judgment by the appellate court would do as between the parties thereto. *Sullivan* v. *Gage,* 145 Cal. 759, 770-771, 79 Pac. 537; *Morgan* v. *Clapp,* 207 Cal. 221, 277 Pac. 490; *Pender* v. *Felts,* 2 Smedes & M. (Miss.) 535; *Wilson* v. *Montgomery,* 22 Miss. (14 Smedes & M.) 205; *Jones* v. *Pharis,* 59 Mo. App. 254.[6]

---

[5] Dismissal for failure to print the record, *Cobbs* v. *Gilchrist's Adm'r,* 80 Va. 503; *Woodson's Ex'r* v. *Leyburn,* 83 Va. 843, 3 S. E. 873; *Beecher* v. *Lewis,* 84 Va. 630, 6 S. E. 367. Dismissal for failure to give appeal bond, *Hicks* v. *Roanoke Brick Co.,* 94 Va. 741, 744, 27 S. E. 596. See, also, *Alvey* v. *Cahoon,* 86 Va. 173, 9 S. E. 994.

[6] See, also, the following cases which apply the same rule even where there has been an affirmance of the judgment upon grounds

It is contended, however, that as the order of dismissal states that the writ of error and supersedeas was "dismissed agreed," the rule above announced with reference to the effect of a dismissal has no operation in the instant case. Whatever may be the effect in general of an order "dismissed agreed,"[7] in this case it cannot make the rule above announced applicable, because the record here does not show that the county of Warren was a party to the agreement between Warthen and Aetna Casualty and Surety Company in accordance with which the writ of error was dismissed. No agreement made between Warthen and Aetna Casualty and Surety Company could have had the effect of releasing the latter from liability to the county of Warren on his bond; and no agreement between them that a void order releasing the company from liability to the county on his bond should be treated as a valid order could have had that effect.

Our conclusion is that the order of October 13th relieving The Aetna Casualty and Surety Company was void and ineffective to relieve it from liability to the county on Warthen's official bond, and has remained so, notwithstanding the fact that the writ of error was "dismissed agreed."

The next two questions presented by the proceedings had in October, 1927, and upon the writ of error to the order therein entered are these:

Did the suspending order of October 31, 1927, and the

not raising the question whether it is void or not: *Revere* v. *Revere*, 133 Kan. 301, 299 Pac. 595; *Chambers* v. *Hodges*, 23 Tex. 104; *Finch* v. *Hollinger*, 46 Iowa 216; *Gaskins* v. *Mack*, 91 Fla. 284, 107 So. 918.

[7] For cases dealing with the effect of an order "dismissed agreed" entered by a trial court, see *Hoover* y. *Mitchell*, 25 Gratt. (66 Va.) 387, disapproving of opinion of Chief Justice Marshall in *Hoffman* v. *Porter*, 2 Brock. 156, Fed. Cas. No. 6577; *Siron* v. *Ruleman's Ex'r*, 32 Gratt. (73 Va.) 215; *Wohlford* v. *Compton*, 79 Va. 333; *Pethtel* v. *McCullough*, 49 W. Va. 520, 39 S. E. 199; *Bank of Commonwealth* v. *Hopkins*, 2 Dana (Ky.) 395; *Jarboe* v. *Smith*, 10 B. Mon. 257, 52 Am. Dec. 541; Freeman on Judgments (5th ed.) section 757, p. 1595.

For cases dealing with the effect of an order "dismissed agreed" entered by an appellate court, see *Fletcher* v. *Parker*, 53 W. Va. 422, 44 S. E. 422, 97 Am. St. Rep. 991; *Simmons* v. *Yoho*, 92 W. Va. 703, 115 S. E. 851.

supersedeas allowed by one of the judges of this court, have the effect of continuing Warthen in office, pending his appeal, until his then term of office expired?

If so, did Aetna Casualty and Surety Company remain bound as surety on his official bond until the end of his term on December 31, 1927?

The trial court did not expressly pass upon these questions, but its decree seems to be predicated upon the conclusion that the first question should be answered yes, and the second question no. And all counsel in the case seem to have assumed, without discussion of the point, that the effect of the suspending order and the supersedeas was to continue Warthen in office until the end of his term. For the reasons stated we are of the opinion that both of these questions are to be answered yes.

During the early days of the Commonwealth a supersedeas was an independent process by which the record was brought up for review by a superior court and further proceedings in the cause in the court below were stayed. *White .v. Jones,* 1 Wash. (1 Va.) 116; *Burwell* v. *Anderson,* 2 Wash. (2 Va.) 194; *Wingfield* v. *Crenshaw,* 3 Hen. & M. (13 Va.) 245; *Day* v. *Pickett,* 4 Munf. (18 Va.) 104. But it is now, and has long been, in practice at least, merely an auxiliary process used as an adjunct to an appeal or a writ of error. Burks' Pleading and Practice (2d ed.) page 746.

Its scope as an auxiliary process under the existing statutes of Virginia is defined in section 6348, Code Va. 1919, as amended by Acts 1922, page 47, chapter 45, which so far as is here material reads:

"The court or judge, to whom the petition is duly presented, if of opinion that the decision complained of ought to be reviewed, may allow an appeal or writ of error, and in either case may award a *supersedeas to stay proceedings in whole or in part.*" (Italics ours.)

It operates to stay all *further* proceedings on the judgment, or as to any matter embraced therein. Its effect is

to prevent the enforcement of the judgment to any *further* extent than has been had at the time it becomes effective, and, thereby, to preserve the *status quo* at the time the supersedeas becomes effective. But it does not vacate or annul, even conditionally, the judgment, or impair its validity and effect as a judgment; nor does it operate retrospectively to undo what has already been done thereby or thereunder, or to restore and maintain the *status quo* existing at the time the judgment appealed from was rendered. Hence, what has been done thereby or thereunder before the supersedeas takes effect is upheld by the authority of the judgment; but after the supersedeas becomes effective, and while it remains in effect, what is done under authority of the judgment or toward its further enforcement is invalid, because the prospective authority of the judgment has been, in effect, suspended by the supersedeas. *White* v. *Jones,* 1 Wash. (1 Va.) 116; *Hudgins* v. *Marchant,* 28 Gratt. (69 Va.) 177; *Morriss* v. *Garland's Adm'r,* 78 Va. 215, 229; *Bristow* v. *Home Bldg. Co.,* 91 Va. 18, 20 S. E. 946, 947; *Martin* v. *South Salem Land Co.,* 94 Va. 28, 26 S. E. 591; *Runyon* v. *Bennett,* 4 Dana (34 Ky.) 598, 29 Am. Dec. 431; *Powell* v. *Florida L. & Imp. Co.,* 41 Fla. 494, 26 So. 700; *Haddick* v. *District Court,* 164 Iowa 417, 145 N. W. 943; *Randles* v. *Randles,* 67 Ind. 434; *Relph* v. *Randles,* 67 Ind. 600; *Dulin* v. *Pacific Wood, etc., Co.,* 98 Cal. 304, 33 Pac. 123; 3 C. J. (Appeal and Error), section 1446 *et seq.;* 2 R. C. L. p. 122 *et seq.*

 To the extent that a judgment has become executed at the time a supersedeas thereto becomes effective, the supersedeas is without effect, and where a judgment has become fully executed at the time a supersedeas becomes effective, the supersedeas has no effect, because there is nothing upon which it can operate. *White* v. *Jones,* 1 Wash. (1 Va.) 116; *Hudgins* v. *Marchant,* 28 Gratt. (69 Va.) 177; *Bristow* v. *Home Bldg. Co.,* 91 Va. 18, 20 S. E. 946, 947, a case in which a receiver had been appointed and had taken possession; *Virginia, Tenn. & Car. Steel, etc., Co.* v. *Wilder,*

88 Va. 942, 14 S. E. 806, a case in which a receiver had been appointed and had not taken possession; *Allen* v. *Church,* 101 Iowa 116, 70 N. W. 127; *Randles* v. *Randles,* 67 Ind. 434; *Relph* v. *Randles,* 67 Ind. 600; *Dulin* v. *Pac. Wood, etc., Co.,* 98 Cal. 304, 33 Pac. 123; and cases cited in note 9, post.

Some judgments are self-executing[8] (that is, require no affirmative action of the court, or action under a process issued by the court, to execute them), and are fully executed when they are rendered. For instance, a judgment quieting title to land which is in the possession of the plaintiff is fully executed when the judgment is rendered. Some judgments are self-executing in part, as for instance, a judgment for money which is made by operation of law a lien on the real estate of the judgment debtor from the time the judgment is rendered. Such a judgment is self-executing in so far as the establishment of the lien is concerned, but not in so far as the enforcement of the lien or the payment of the money is concerned. Others are not self-executing in whole or in part, as for instance, a judgment in favor of the plaintiff in an action of ejectment.

Generally, where a judgment is self-executing, if its execution of itself has not been stayed or postponed by the court rendering it, a supersedeas thereof does not have the effect of suspending the operation of the judgment pending a decision by the appellate court.[9] A judgment

---

[8] In *Dulin* v. *Pacific Wood, etc., Co.,* 98 Cal. 304, 33 Pac. 123, the court cites the following judgments as examples of self-executing judgments: A judgment granting a prohibitory injunction or dissolving an injunction, or determining the status of an individual or granting or denying a divorce or annulling a marriage, or quieting title to a tract of land, or setting aside the execution of a deed. (As herein used judgments include judgments, decrees and orders.)

[9] See to the effect that a supersedeas to a decree granting a prohibitory injunction does not have the effect of suspending the operation of the injunction pending a decision by the appellate court, so as to permit the doing of the act prohibited, though it does have the effect of suspending the efficacy of a mandatory injunction, 2 High on Injunctions (4th ed.) section 1698 and section 1698a; *State ex rel. Gibson* v. *Superior Court,* 39 Wash. 115, 80 Pac. 1108, 109 Am. St. Rep. 862, 1 L. R. A. (N. S.) 554 and note, 4 Ann. Cas. 229, and note; *Hulbert* v. *California Portland Cem. Co.,* 161 Cal. 239, 118 Pac. 928, 38 L. R. A. (N. S.) 436 and note; *Genet* v. *Del. & H. Canal Co.,*

removing an officer from office is self-executing, and if its execution of itself is not stayed or postponed by the court rendering it, a writ of error and supersedeas to the judgment does not have the effect of continuing the officer in office pending a decision of the appellate court. *Welch* v. *Cook*, 7 How. Pr. (N. Y.) 282; *McVeany* v. *Mayor, etc., of City of New York*, 80 N. Y. 185, 36 Am. Rep. 600; *People ex rel. Dibelka* v. *Reinberg*, 263 Ill. 536, 105 N. E. 715, L. R. A. 1915E, 401, Ann. Cas. 1915C, 343; *Fawcett* v. *Superior Court of Pierce County*, 15 Wash. 342, 46 Pac. 389, 55 Am. St. Rep. 894; *Allen* v. *Robinson*, 17 Minn. 113 (Gil. 90); *Honey* v. *Davis*, 38 Tex. 63; *State* v. *Meeker*, 19 Neb. 444, 27 N. W. 427; *Jayne* v. *Drorbaugh*, 63 Iowa 711, 17 N. W. 433; *People* v. *Stephenson*, 98 Mich. 218, 57 N. W. 115; *Fylpaa* v. *Brown County*, 6 S. D. 634, 62 N. W. 962; *State ex rel. Craig* v. *Woodson*, 128 Mo. 497, 31 S. W. 105; *State* v. *Wilson*,[10] 121 N. C. 480, 28 S. E. 554, 61 Am. St. Rep. 672; *Mayor, etc., of City of Macon* v. *Shaw*, 14 Ga. 162; 46 C. J. 1013. See, also, *State* v. *Johnson*, 40 Ga. 164.[11]

113 N. Y. 472, 21 N. E. 390; *Barnes & Co.* v. *Chicago Typo. Union*, 232 Ill. 402, 83 N. E. 932, 122 Am. St. Rep. 129, 14 L. R. A. (N. S.) 1150 and note. See, also, *Layne* v. *Com.*, 144 Va. 684, 132 S. E. 306.

It has been held in Virginia and West Virginia that an appeal from and supersedeas to a decree dissolving a preliminary injunction has the effect of keeping the injunction in effect pending appeal. *Turner* v. *Scott*, 5 Rand. (26 Va.) 332; *State* v. *Harness*, 42 W. Va. 414, 26 S. E. 270. See, also, *Epes's Adm'rs* v. *Dudley*, 4 Leigh (31 Va.) 145; *Jeter* v. *Langhorne*, 5 Gratt. (46 Va.) 193; *State* v. *Harper's Ferry Bridge Co.*, 16 W. Va. 864. See, also, in this connection, section 6338, Code Va. 1919. But see, *contra*, *Hovey* v. *McDonald*, 109 U. S. 150, 3 S. Ct. 136, 27 L. Ed. 888; *Weeks* v. *Smith*, 3 Abb. Pr. (N. Y.) 211; *Blount* v. *Tomlin*, 26 Ill. 531.

See holding that in a *habeas corpus* proceeding the judgment is self-executing, and there is nothing that can be stayed by a supersedeas, *Willis* v. *Willis*, 165 Ind. 332, 75 N. E. 655, 2 L. R. A. (N. S.) 244, and note, 6 Ann. Cas. 772 and note 775; 21 Cyc. 342; 1 Va. L. Reg. 81. See, also, in this connection, section 5859, Code Va. 1919.

See holding that an order disbarring an attorney is self-executing and a supersedeas thereto does not operate to permit him to practice pending appeal. *Walls* v. *Palmer*, 64 Ind. 493; *Tyler* v. *Presley*, 72 Cal. 290, 13 Pac. 856; *Heffren* v. *Jayne*, 39 Ind. 463, 13 Am. Rep. 281. *Contra*, *Bird* v. *Gilbert*, 40 Kan. 469, 19 Pac. 924.

10 But see *Herring* v. *Pugh*, 126 N. C. 852, 36 S. E. 287.

11 See, *contra*, *Covarrubias* v. *Board of Sup'rs of Santa Barbara County*, 52 Cal. 622; *Morton* v. *Broderick*, 118 Cal. 474, 50 Pac. 644; *In re Advisory Opinion to the Gov.*, 75 Fla. 674, 78 So. 673; *Grelle* v. *Pinney*, 62 Conn. 478, 26 Atl. 1106.

 But the order of suspension entered by the trial court in this case had the effect of staying or postponing the self-execution of the order removing Warthen from office (*i. e.*, the order of October 24th) and to continue him in office during the period of the suspension; and as the supersedeas became effective before the period of suspension expired and preserved the *status quo* existing at the time it became effective, it operated to continue Warthen in office pending his appeal.

Section 6338, Code of Virginia 1919, provides as follows:

"At the instance of any person who desires to present such petition, the court in which the judgment, decree, or order is, may, during the term at which it is rendered or made, or the judge rendering such judgment, order or decree, may, within thirty days after such term is ended, make an order suspending the execution of such judgment, decree, or order, for a reasonable time, to be specified in such order, when such person shall give bond, with surety, before the clerk of said court, in such penalty as the court or judge may require, with a condition reciting such judgment, decree, or order, and the intention of said person to present such petition, and providing for the payment of all such damages as may accrue to any person by reason of the said suspension, in case a supersedeas to such judgment, decree, or order, should not be allowed, and be effectual within the time so specified. But where the judgment, decree or order appealed from dissolves an injunction the judge may in his discretion decline to grant a suspension of such judgment, decree or order."

 Under this section the trial court in a civil proceeding[12] is empowered to suspend or refuse to suspend the execution of a judgment, decree or order to permit an appeal therefrom as it may deem proper.[13] The execution of

---

[12] See section 4930, Code, for rule in criminal cases, in many of which the stay of execution is made mandatory.

[13] Any doubt as to the fact that in a civil case the court may grant or refuse a suspension of the execution of a judgment, decree or order is removed when it is compared with section 4930, and when

a self-executing judgment, decree or order, as well as one which is not self-executing, may be stayed or suspended by the court rendering it.[14] *Strangways* v. *Ringgold,* 106 Ark. 433, 435, 153 S. W. 619; *Genet* v. *President, etc., of Delaware & H. Canal Co.,* 113 N. Y. 472, 21 N. E. 390; *City of Cincinnati* v. *Cincinnati, etc., Ry. Co.,* 56 Ohio St. 675, 47 N. E. 560; *State* v. *Harper's Ferry B. Co.,* 16 W. Va. 864. The power to suspend execution of its judgments, decrees and orders is not limited under section 6338 to staying further proceedings for the enforcement thereof, but extends to the suspension of the execution of the judgment, decree or order however it may be executed, including its execution *ex proprio vigore.*

When a self-executing judgment is entered and as a part of the same judgment its execution is suspended for a specified time, its power to execute itself does not attach until the expiration of the suspension. During the term at which a judgment is rendered, it remains in the breast of the court, and may be vacated or modified if the court deem proper. An order entered at a later day in the term suspending the execution of a self-executing judgment is an order modifying the former order. *City of Cincinnati* v. *Cincinnati, etc., Ry. Co.,* 56 Ohio St. 675, 47 N. E. 560. And, except perhaps as to some acts done under authority of the judgment before there has been a suspension thereof, the suspension of a judgment[15] by an order entered at a later day in the term has the same effect as if it had been incorporated in the original order. The provision in section

the history of the statute is considered. The last sentence of section 6338 was not added until 1908. For history of section 6338, Code 1919, see Acts 1908, p. 36, ch. 31; Code 1887, section 3456; Acts 1869-70, ch. 171, section 4, p. 222; Code 1849, ch. 182, section 4; Acts 1831-2, p. 41; Acts 1827-28, p. 21.

[14] It has been held that there are some judgments which as a matter of law a court has no power, even under such a statute as section 6338, to suspend pending an appeal; but however this may be, a judgment removing an officer is not such a judgment.

[15] We are advised by the clerk of the trial court that the suspending order in this case was in fact entered on the last day of the term (October 31) at which the order of removal was entered on October 24; but that fact does not appear from the record in the instant case.

6338 authorizing the court, or judge, to enter an order suspending the execution of a judgment at any time within thirty days after the end of the term at which the judgment was rendered has the effect of extending the power of the court over the judgment, for that purpose, for that length of time, and of giving to an order of suspension entered within thirty days after the end of the term, the same force and effect as if it had been entered during the term. See *State v. Harper's Ferry B. Co.*, 16 W. Va. 864, decided under a statute almost identical in terms with section 6338.

To résumé, our conclusion on this subject is this: Where a judgment of ouster has been entered against an officer, if the execution of the judgment is not suspended by the trial court, it executes itself *ex proprio vigore,* and the officer is not restored to office by a supersedeas subsequently awarded. But the trial court has the power, if it deems proper, to suspend the judgment in accordance with the provisions of section 6338, and if it does so at the time the judgment is entered, or within thirty days after the end of the term at which it is entered, the suspension operates to prevent the self-execution of the judgment, and continues the officer in office during the period of the suspension; and, as a supersedeas stays all further execution of the judgment, if a supersedeas becomes effective during the period of suspension, it will operate to continue the officer in office pending a decision of the case in the appellate court, or until the expiration of his term, if his term expires pending this appeal.

As the surety on the official bond of a treasurer can be relieved of its suretyship only (1) by the treasurer giving a new bond, or (2) by the removal of the treasurer from office, so long as the suspending order and supersedeas continued Warthen in office they continued the liability of The Aetna Casualty and Surety Company as surety on his bond.

This brings us to the questions which are raised with reference to the liabilities of the sureties on the sus-

pending and supersedeas bonds *as between themselves and The Aetna Casualty and Surety Company.*

The Aetna Casualty and Surety Company contends that, as between it and the sureties on the suspending and supersedeas bonds, the sureties on these two bonds are primarily liable not only for all defalcations and defaults made by Warthen after these bonds were executed, but also for all sums which Aetna Casualty and Surety Company may be liable under its bond on account of defalcations and defaults made by Warthen prior to entry of the order removing him from office entered October 24, 1927. In support of this contention it cites the cases listed in the footnote.[16]

The doctrine of these cases is this: Where there is a judgment or decree against a principal debtor and his surety, and a third party, at the instance of the principal and for his sole benefit, without the consent or agreement of the original or prior surety and probably, or possibly, to his prejudice, enters as surety for the principal in an obligation, the effect of which is to suspend the execution of the judgment or decree and thus prejudice the rights of the first surety, the equities of the prior surety are superior, if the prior surety, by virtue of his undertaking, has to pay the judgment or any other obligation for the payment of which the surety on the suspending or supersedeas bond is bound under his bond; and the prior surety will be subrogated to all the rights of the creditor under the suspending or supersedeas bond against the surety thereon.

This doctrine, however, has no application to extend the scope of the liability of the surety on a suspending or supersedeas bond beyond the scope of the terms of the bond. It

[16] *Harnsberger* v. *Yancey*, 33 Gratt. (74 Va.) 527; *Hanby's Adm'r* v. *Henritze's Adm'r*, 85 Va. 177, 7 S. E. 204; *Broughton* v. *Saylor*, 129 Ky. 180, 110 S. W. 866; *National Surety Co.* v. *White*, 21 Ga. App. 471, 94 S. E. 589; *Hinckley* v. *Kreitz*, 58 N. Y. 583; *Schnitzel's Appeal*, 49 Pa. 23; *Alleghany Valley R. Co.* v. *Dickey*, 131 Pa. 86, 18 Atl. 1003; *Fidelity & Deposit Co.* v. *Bowen*, 123 Iowa 356, 98 N. W. 897, 6 L. R. A. (N. S.) 1021 and note; *Opp* v. *Ward*, 125 Ind. 241, 24 N. E. 974, 21 Am. St. Rep. 220; *Southwestern Surety Ins. Co.* v. *King*, 68 Okl. 100, 172 Pac. 74, L. R. A. 1918D, 1188 and note; *Hartwell* v. *Smith*, 15 Ohio St. 204.

subrogates the prior surety to such rights, and only such rights, as the creditor has against the surety on the suspending or supersedeas bond. It does not enlarge those rights.

In the instant case the terms of neither the suspending bond nor the supersedeas bond obligate the sureties thereon to pay or make good the defalcations and defaults of Warthen which occurred prior to the entry of the order removing him from office; and the doctrine above mentioned has no application which will extend the obligations of these bonds so as to include an obligation to do so.

The condition of the suspending bond is that the parties thereto will pay "such damages as may accrue to any person by reason of the said suspension of the order of this court entered October 24, 1927, above referred to; in case a supersedeas to such an order shall not be allowed and be effectual within the time herein specified"—*i. e.*, twenty days from October 31, 1927. This condition was fully performed when the supersedeas was allowed and the supersedeas bond executed; and in no event could the sureties on the suspending bond have incurred any liability to any one under this bond.

The condition of the supersedeas bond (executed November 19, 1927) is that "Warthen shall well and truly comply with, perform, and satisfy the orders and judgments appealed from in case the same shall be affirmed, or the said writ of supersedeas shall be dismissed, and shall pay all damages, cost and fees which may be awarded against, or incurred by him, in the appellate court, and all actual damages incurred in consequence of the supersedeas."

The orders appealed from ordered Warthen to turn over to the clerk of the court all money and property then in hand belonging to Warren county; but no judgment was entered against Warthen for the payment by him of any sum on account of defalcations or defaults which had been made by him, nor was it adjudged that he had theretofore made any defalcations or defaults. The court was there-

fore right in not holding that the sureties on the suspending and supersedeas bonds were liable over to Aetna Casualty and Surety Company for the payment of all sums which it was required to pay on account of Warthen's defalcations and defaults prior to October 24, 1927; and in limiting the scope of the liability of the sureties on the supersedeas bond on account of such items to the "actual damages incurred in consequence of the supersedeas."

We also agree with the trial court, that, in so far as relates to its liability on account of defalcations and defaults of Warthen made prior to October 24, 1927, the record fails to establish that Aetna Casualty and Surety Company suffered any damages in consequence of the supersedeas; and that it is not entitled to recover over from the sureties on either the suspending bond or the supersedeas bond any sum which it may have to pay on account of Warthen's defalcations and defaults made prior to October 24, 1927.

So far as the record shows there were no defalcations or defaults made by Warthen during the period October 24-31, 1927. For all defalcations and defaults made by Warthen during the period October 31-December 31, 1927, both Aetna Casualty and Surety Company and the sureties on the supersedeas bond became, and as will hereafter appear, remain liable to the county under their respective bonds; but as between themselves the sureties on the supersedeas bond are primarily liable therefor and Aetna Casualty and Surety Company are secondarily liable therefor. See cases cited note (16) *ante*.

This disposes of the questions arising out of the proceedings had in October, 1927, for the release of Aetna Casualty and Surety Company from further liability on Warthen's bond and for the removal of him from office. Before taking up in detail the questions raised by the other assignments of error and cross-error, it will be well to state, in more connected form than can readily be done in a separate consideration of the several assignments, what in some

particulars we conceive to be the law relative to some of the duties and liabilities of county treasurers.

██ The liability of a county treasurer is of two kinds. As to uncollected tax tickets his liability is that of a debtor. As to moneys received by him in payment of taxes, or any other money received by him which belongs to the Commonwealth or the county, his liability is that of a special bailee, subject to very strict obligations. *Mecklenburg County* v. *Beales,* 111 Va. 691, 69 S. E. 1032, 36 L. R. A. (N. S.) 285; *U. S.* v. *Prescott,* 44 U. S. (3 How.) 578, 11 L. Ed. 734.

 He is the custodian of all money received by him, including that which he himself places in his own hands as treasurer in settlement of uncollected tax tickets; and he is required to hold it in his hands in kind until it is disbursed by him according to law. He may not lend it or make any use thereof for any purpose whatever other than such as is provided by law. Section 2788, Code of Virginia 1919; Tax Code of Virginia (Acts 1928, p. 35, ch. 45) section 362. Where, however, he acts in good faith, he may deposit money received by him in bank to his account as treasurer, without being guilty of making a misappropriation thereof by so depositing it; and in any settlement of his accounts made during his continuation in office, certificates from the proper officers of a solvent bank, showing that he has therein on deposit to his account as treasurer a specified amount of money, may be accepted in lieu of the production of the cash as evidence of the fact that he has in his hands as treasurer the amount of money which he should have on hand.

██ Section 359, Tax Code of Virginia (section 2786, Code of Virginia 1919), requires the treasurer to settle his accounts with the county at the July meeting of the board of supervisors, or within sixty days thereafter. Section 2201, Code of Virginia 1919, which was repealed by section 436, Tax Code of Virginia (Acts 1928, p. 35, ch. 45), was in effect throughout practically the whole of the period with which we are here concerned. In so far as it is here mate-

rial it is quoted in the footnote.[17] While these two sections give the treasurer until October 1 to place in his hands in money the amount of the uncollected tax tickets for the preceding fiscal year which he had on hand on July 1, neither it nor any other statute relieves him of the duty to have on hand at all times all the money which has been received by him for the account of the Commonwealth or the county, which has not been disbursed by him in accordance with law. And if he "knowingly" misuses or misappropriates money which has once come into his hands as treasurer, or knowingly disposes thereof otherwise than in accordance with law, he is guilty of the embezzlement thereof. Section 4452, Code of Virginia 1919. See, also, section 2774, Code of Virginia 1919; Tax Code of Virginia (Acts 1928, p. 35, ch. 45) sections 349 and 354.

Property taxes are levied for the calendar year, but the fiscal year has the more important bearing on the liability of the treasurer for the collection thereof. The fiscal year of the Commonwealth begins on July 1 and ends June 30 following, and this is also the fiscal year of the counties. Section 2172, Code of Virginia 1930; section 2786, Code of Virginia 1919; Tax Code of Virginia (Acts 1928, p. 35, ch. 45), section 359.

The commissioner of revenue is required to deliver to the treasurer a copy of the assessments of property taxes by September 1 of the calendar year for which they are assessed; and the treasurer is required to make out tax tickets for the several assessments and to begin to receive the payments of taxes as soon as the copies of the assessments

---

[17] Section 2201, paragraph 5, Code of Virginia 1919:

"The treasurers of the several counties of this State shall settle with the board of supervisors and school boards by the first day of October of each year, and shall, on said first of October, exhibit to said judge and Commonwealth's attorney the cash to balance their accounts, if any is due, with the county levy and the county school fund. If any treasurer fail to produce said cash to balance his said account, then said court shall, after service of rule as prescribed by paragraph three of this section, suspend said treasurer, and appoint some competent person to discharge his duties, as provided in said paragraph."

are delivered to him. These tax tickets have in many respects the effect of a *fieri facias,* and when a tax assessment is paid the treasurer is required to deliver to the taxpayer the tax tickets therefor duly receipted so as to show the date upon which the payment was received. Sections 2408-2409, Code of Virginia 1919; section 370, Tax Code of Virginia (Acts 1928, p. 35, ch. 45). Under section 2410, Code 1919, the taxpayer was given until and including December 1st in which to pay his taxes without penalty. By Acts 1926, p. 313, ch. 170, this period was extended to December 15th;[18] as to all taxes except capitation taxes; but after that date a penalty of five per cent is added to the amount of his taxes.

As soon as the tax assessments come into his hands for collection, the treasurer immediately becomes chargeable with the amount thereof. It is, however, provided by statute that in any settlement of his accounts the treasurer may account for uncollected tax tickets for the "current fiscal year" by the production of the tickets themselves, and if the settlement be with his successor in office, may relieve himself of all liability for the uncollected tax tickets for the "current fiscal year" by delivering them to his successor. Sections 2779 and 2792, Code of Virginia 1919; sections 353 and 367, Tax Code of Virginia (Acts 1928, p. 35, ch. 45). Thus in any settlement made prior to July 1st next succeeding the time that the assessments of property taxes come into his hands, he may account for uncollected tax tickets made out therefor by producing or delivering such tickets, for they constitute tax tickets for the current fiscal year. After that date (July 1st) such uncollected tax tickets are no longer tax tickets for the current fiscal year, and he becomes absolutely bound for the payment in money of the amount of all thereof which have not been, or are not there-

---

[18] By Acts 1928, p. 35, ch. 45, and Acts 1930, p. 121, enacting and amending section 372 of the Tax Code, this date was fixed as, and now is, December 5.

after allowed to him as uncollectible (*i. e.*, in common parlance, delinquent), and he cannot account therefor by the production or delivery of the tax tickets.

Though he becomes chargeable with the amount of the tax assessments as soon as they come into his hands for collection, a tax assessment, and the tax ticket made out therefor, is the property of the Commonwealth and/or the county until the treasurer during his occupancy of the office has either received payment thereof or himself settled therefor by placing in his hands in his official capacity the amount of money required to pay it, or has paid to his successor in office, if another, the amount thereof. It is true that after July 1 he can no longer account for uncollected tickets for the preceding fiscal year by the production or delivery of them, and that the statutes contemplate that when his term of office terminates he shall retain in his hands all uncollected tax tickets (except those for the current fiscal year) ; but neither nor both of these facts operate to vest the absolute title to such tickets in him as his individual property. Until he has in fact settled for an uncollected tax ticket in money, the net amount of money received by him thereon belongs, upon its receipt, to the Commonwealth and/or the county. The receipt of the money reduces, *pro tanto*, his obligation as a mere debtor and increases, *pro tanto*, his obligation as a special bailee.

Until he has in fact settled for a tax ticket, he owes to the government the duty to collect it and turn over to the government the proceeds thereof; and this duty continues even after his term of office has terminated and he has been succeeded by another. At times there may arise circumstances which make it necessary for him, in the performance of this duty in good faith, to incur expenses in and about the collection of a tax ticket by court procedure, or by the use of the services of another. Where, acting in good faith, he does so, and pays such expenses, or permits them to be paid, out of the money collected there-

on, he is not guilty of a misappropriation of funds. He and his sureties, of course, remain bound for the full amount of the tax tickets, but he is liable as a bailee for only the net proceeds of the collection. This applies also to his personal representative if he dies before he has in fact settled in full for tax tickets in his hands.

The bond given by Warthen on which National Surety Company is surety recites the election of Warthen as treasurer for a term of four years beginning January 1, 1928, and is conditioned that he "shall faithfully discharge the duties of his office or trust as treasurer of Warren county aforesaid," i. e., during the term recited. The bonds given by him for his two prior terms beginning January 1, 1920 and 1924, were of the same nature. Under such a bond there is no liability on the surety except such as springs from some breach of trust or duty committed by the officer after the commencement of the term for which it was given, nor, subject to some exceptions which need not be here noticed, is there any liability on the surety except such as springs from a breach of duty or trust committed during the term for which it is given or in settling his accounts at the end thereof. U. S. v. Irving, 42 U. S. (1 How.) 250, 11 L. Ed. 120; City of Detroit v. Weber, 29 Mich. 24; 22 R. C. L. p. 515, section 199; 43 C. J. 726. See, also, Coplin v. M'Calley, 1 Leigh (28 Va.) 280, 284, 19 Am. Dec. 748; Com. v. Fairfax, 4 Hen. & M. (14 Va.) 208; Munford v. Rice, 6 Munf. (20 Va.) 81; Tyler v. Nelson's Adm'x, 14 Gratt. (55 Va.) 214, 221. The fact that the several official bonds of Warthen here under consideration were all given for a term of office to which he had been elected as his own successor, did not operate to enlarge the obligation of the bond so as to make the surety liable other than for breaches of duty or trust committed after the beginning of the term for which it was given.

Where an officer serves two successive terms, for each of which he gives a bond conditioned for the faithful performance of his duties during that term, if the sureties

on the successive bonds are not the same, the liabilities of the several sets of sureties to the government, and the liabilities of the sureties *inter se,* are to be determined as if such officer had been succeeded by another person, and such other person had given bond for the later term with the sureties on the later bond as his sureties. *U. S.* v. *Irving,* 42 U. S. (1 How.) 250, 11 L. Ed. 120; *State* v. *Causey,* 93 S. C. 300, 76 S. E. 707; *City of Detroit* v. *Weber,* 29 Mich. 24. See, also, *Baker* v. *Preston,* 1 Gilmer (21 Va.) 235, at p. 292. Where the officer succeeds himself there are certain *prima facie* presumptions of law in the light of which the rule stated in the last sentence is to be applied; but, whether the bond be that of a new incumbent or of an officer who is succeeding himself, the liability of the surety thereon is limited to liability for breach of duty or trust committed by the officer after the commencement of the term for which it is given.

 If, at the time a tax ticket for which the treasurer has not in fact settled is collected, his term of office has terminated, and the treasurer has not succeeded himself, the sureties on his bond remain liable for the money received by him thereon; but his successor does not (in the absence of neglect on his part to collect therefor from his predecessor) become liable therefor until it is paid to him by his predecessor. If, however, the treasurer has succeeded himself, the rule is different.

 If a treasurer, who at the time he succeeds himself owes the county a sum of money for uncollected tax tickets for preceding fiscal years, subsequently and while that indebtedness remains unpaid, collects such uncollected tax tickets, the receipt of the money *ex proprio vigore* has the same effect as if he, having been succeeded by another, had collected this amount of money and paid it immediately to his successor to be applied on his indebtedness existing on account of the tax tickets collected. The sureties on his prior bond are relieved *pro tanto* of their indebtedness to the county, and the sureties on the bond for his then term

become liable for any misapropriation or misuse of the money. It is true that he makes the collection by virtue of having held office for the prior term; but it is money belonging to the county which has in fact reached his hands in his present capacity as treasurer, and having so reached his hands he is liable therefor in that capacity. Further, when it reaches his hands it is impressed by law with an application to his indebtedness existing on account of his failure to have collected theretofore those particular tax tickets; and he cannot by any dealings had with himself make an application of it to any other obligation of his to the county, so as to prevent the receipt thereof from relieving *pro tanto* the sureties on his prior bond and charging the sureties on his bond for his then term therewith.

On the other hand, a treasurer who has succeeded himself cannot, by any dealings had by himself with himself, make an application of money received by him from the collection of the revenue accruing during his second term to the payment of items of indebtedness that accrued during his prior term of service, which will be operative to relieve the sureties on his bond for the prior term from liability for such prior indebtedness. The application by him of such money to make good a default committed by him during his prior term or to conceal and cover up such a default is a breach of duty committed during the second term, and will render the sureties on his bond for the second term liable for the money so misapplied. Mechem on Pub. Officers, section 287; Throop on Pub. Officers, section 219; *People* v. *Hammond,* 109 Cal. 384, 42 Pac. 36; *County of Pine* v. *Willard,* 39 Minn. 125, 39 N. W. 71, 1 L. R. A. 118, 12 Am. St. Rep. 622. But the fact that such misuse makes the sureties on the second bond liable for such misappropriation does not relieve *pro tanto* the sureties on the prior bond from liability to the government for the original default. *Pro tanto* both sets of sureties are liable to the government; but generally, as between themselves, the sureties on the first bond are primarily liable, and those on

the second bond secondarily liable. However, a treasurer's bond is not conditioned that he will answer to the government alone for a breach of duty or trust; but his bond obligates him and his sureties to answer to the government or any person injured by a breach of duty or trust by the treasurer, and to the extent that the sureties on the first bond suffer actual damage from the use of funds received during the second term to conceal and cover up defaults committed during the first term the sureties on the second bond become primarily liable.

The doctrine of *Baker* v. *Preston,* 1 Gilmer (21 Va.) 235; *Chapman* v. *Com.,* 25 Gratt. (66 Va.) 721; and *Crawn* v. *Com.,* 84 Va. 282, 4 S. E. 721, 10 Am. St. Rep. 839, has no application to a case in which a treasurer, who succeeds himself, has by dealings had with himself misappropriated money received by him during his second term by so applying it as to cover up or conceal an indebtedness which accrued during his first term. Those were cases in which money received from revenue accruing during a second term had been paid over by the treasurer to *another officer* of the government with whom he was required to settle, without any instructions from the treasurer as to how it should be applied; and the money had been applied by such other officer in good faith, and without knowledge as to the source from which such money had come, to the oldest items of the treasurer's indebtedness. Further, those cases were concerned only with the question of whether the sureties on the bond for the later term were responsible for such misappropriation of the money. It is to be doubled whether there is anything said in those cases which can be properly construed to hold that under even the facts of those cases the sureties on the bond for the prior term were released from their liability by such misappropriation; but in so far as anything said in any of those cases may properly be construed to so hold by *dictum* or otherwise, it is disapproved.

A warrant for the payment of a sum payable by

a county is drawn upon the treasurer of the county, not upon the particular person who occupies the office at the time it is drawn; and it is payable only out of money belonging to the particular fund upon which it is drawn. If it is not presented to, or, if presented to, is not paid by the person who occupies the office at the time it was drawn, it is payable by his successor upon presentation out of any money in his hands belonging to the fund upon which it is drawn. The treasurer for the time being is required to pay the warrants drawn upon any fund in the order in which they are presented as money belonging to that fund is received by him. Sections 2781-2782, Code of Virginia 1919; sections 355-356, Tax Code of Virginia (Acts 1928, p. 35, ch. 45).

If a treasurer, whether he has succeeded himself or not, has in his hands money belonging to a particular fund, it is his duty to pay a warrant drawn upon that fund when it is presented to him, though it may have been drawn prior to the beginning of that term of office. This is true, though the money in his hands belonging to that fund may have come from revenue accrued during his current term. Though the officer may have succeeded himself and at the time owe the county an indebtedness accrued during a prior term for which he has not placed in his hands the money; the payment of the warrant out of money received from revenue of the current term does not *of itself* constitute an application by him of that money to the payment of his prior indebtedness, so as to render the surety on his bond for the current term liable for the misuse of money received from current revenues. It may, however, constitute a use of money received from current revenue to cover up or conceal his failure to have paid the money due by him to that fund at the end of his first term, and to have it on hand to pay such warrant. If so, the concealment will constitute a breach of duty or trust committed during the current term, and will render the surety on his bond for the current term liable for an amount equal to the portion of his

prior indebtedness so covered up and concealed; but it will not release the surety on his prior bond *pro tanto* from liability. Generally speaking, the same rules apply here that apply in any other use of revenue of the current term to cover up or conceal a default occurring during a prior term.

This brings us to the presumptions which are applicable where a treasurer has succeeded himself in office:

 Where all that appears is that at the time in question he is indebted to the county, and there is no evidence to show when his defalcation or default originally occurred, it will be presumed that it occurred during his last term of office. *Stinson* v. *Board of Supervisors,* 153 Va. 362, 149 S. E. 531.

 Where money belonging to the government is proven to have been in his hands at the end of his prior term, there is a conclusive presumption that it was turned over by him to himself as his successor; and the sureties on his bond for the prior term are released from all liability on account thereof.

 Where it is shown that money was actually received by him during his first term and that it should have continued in his possession until the end of his term, there is a *prima facie* presumption that it did so continue in his possession, and was turned over by him to himself as his successor at the beginning of his new term. In such a case, if the county seeks to recover therefor from the surety on his bond for the prior term, or the surety on his bond for the later term seeks to escape liability therefor to the county, the burden is on the county or the surety on the later bond, as the case may be, to show that the money was misappropriated before the commencement of the later term. *Stinson* v. *Board of Supervisors,* 153 Va. 362, 149 S. E. 531; *McMullen* v. *Winfield Bldg., etc., Ass'n,* 64 Kan. 298, 67 Pac. 892, 56 L. R. A. 924, 91 Am. St. Rep. 236. See, also, note 10 Am. St. Rep. 843 *et seq.* But, if it be shown that the money was actually received and misappropriated during the prior term, the burden then rests upon the county,

or the surety on the bond for the prior term, as the case may be, to show that the treasurer made good such misappropriation before or after the beginning of the later term; and the fact that, at the time, and/or after, the misappropriation was made, the treasurer had property out of which he might have provided funds to make good the defalcation, is not of itself sufficient to prove that he did so. *Bissell* v. *Saxton,* 77 N. Y. 191.

Where it is shown that according to his books,[19] or a proper settlement of his accounts, he was indebted to the county at the end of his prior term, without any evidence to show what, if any, part thereof was on account of actual misappropriations of money, in the absence of any evidence to the contrary, there is a *prima facie* presumption that he did his duty and paid to himself at, or after, the beginning of his new term the amount of such indebtedness. Or, to state it otherwise, in such a case there is a *prima facie* presumption that any shortage which is found to exist accrued during his last term, and the sureties on the bond for such term are *prima facie* liable therefor, and those on his bonds for prior terms are *prima facie* not liable therefor. *Stinson* v. *Board of Supervisors,* 153 Va. 362, 149 S. E. 531.

This presumption is strengthened where it is shown that at the end of his old term, or at the time of an audit which is relied upon to establish the existence of such indebtedness, he had in his hands uncollected tax tickets for prior fiscal years equal to the amount of his indebtedness after deduct-

---

[19] In *Baker* v. *Preston,* 1 Gilmer (21 Va.) 235, which was decided by a Special Court, it was held that where a county treasurer was elected for successive terms, the sureties for a later term cannot show that his defaults occurred during a preceding term, where he charged himself with the proper amount of money at the beginning of the later term; in other words, that the entries of a treasurer in his books are conclusive against his sureties. However, the holding of this case was never followed, so far as we can ascertain, in any subsequent case by this court, and has been overruled. In *Robertson* v. *Trigg's Adm'r,* 32 Gratt. (73 Va.) 78, the contrary was held without citing *Baker* v. *Preston.* In *United States F. & G. Co.* v. *Jordan,* 107 Va. 347, 58 S. E. 567, after citing and examining all the Virginia cases in which *Baker* v. *Preston* had been cited and the other Virginia

ing the money held by him in hand or on deposit in bank to his account as treasurer, and there is no evidence tending to show that such tickets were then uncollectible, or have not been collected, or facts inconsistent with their having been collected by him. Also in such a case the fact that the treasurer after the expiration of the prior term had property or income out of which he might have made good his indebtedness is of evidential value in sustaining the *prima facie* presumption that he did so; but it does not make the presumption conclusive. The ability to pay a debt does not constitute the payment thereof.

But these *prima facie* presumptions always yield to proof; and when it is proven that a defalcation or default occurred during or at the end of one term and has not in fact been made good, the surety on the bond given for the term in which the defalcation or default occurred is liable therefor, and the surety on the later bond will not be liable, unless he also has become liable because of some breach of duty or trust committed by the treasurer after the beginning of his last term. But though the surety on the last bond has become also liable, in accordance with the principles hereinbefore stated, generally the primary liability rests upon the surety on the bond for the term during which the original defalcation or default occurred.

It is not here necessary to determine what duty rests upon a new incumbent of the office of county treasurer to collect the amount, if any, for which upon a settlement of his accounts his predecessor in office is indebted to the county. But, where a county treasurer succeeds himself,

cases bearing on the point, the holding in *Baker* v. *Preston* was expressly disapproved. The court there held:

The settlements made by a county treasurer with the board of supervisors of a county are, as against his sureties who have only bound themselves for the faithful discharge by him of the duties of his office, not conclusive, but only *prima facie* evidence of the balance in his hands at the dates of such settlements, respectively. The sureties are not regarded as in privity with their principal so as to be conclusively bound by his acts.

That the doctrine of *Baker* v. *Preston* is the minority view, see note in 60 A. L. R. pp. 1529-1543, and note in 10 Am. St. Rep. 843 *et seq.*

he has, or is charged with, the knowledge of the amount due by him to the county, and the property which he has, and it is his official duty as treasurer for the new term to collect the amount due by him to the county at the end of his prior term from himself and the surety on his bond for such term. If he fails to perform this duty, his surety on his bond for the later term is liable to the county for any loss the county may suffer because of his negligence in performing this duty. *State* v. *Causey*, 93 S. C. 300, 76 S. E. 707. To the extent that he could and should have made such collection from his own funds or property, the surety on the later bond becomes primarily liable and the surety on this prior bond secondarily liable as between themselves; but to the extent that such collections must have been made from the surety on his prior bond, the surety thereon remains primarily liable. However, the fact that had he been pressed for the payment of his prior indebtedness, persons who were in no way legally obligated to answer for his default might have come to his relief and paid his indebtedness for him, does not operate to shift the primary liability from the surety on his bond for a prior term to the surety on his bond for his last term.

Bearing in mind the principles heretofore stated and that Warthen's books and his reports to the State officials charged with the duty of auditing his accounts are *prima facie* evidence against his sureties (see note 19 *ante*), we come now to consider the evidence bearing upon the other assignments of error.

Beginning with 1921, the State inaugurated the system of having an audit of the accounts of county treasurers made annually or oftener where circumstances required it. Up to 1928 these audits were required to be made by the State Accountant, but beginning with 1928 the Auditor of Public Accounts has been charged with this duty.

In 1921, and each year thereafter, one or more audits were made of Warthen's accounts with Warren county; but we need not concern ourselves with any of the audits

made prior to 1923. The dates as of which audits were made in 1923 and thereafter are: August 15, 1923, October 20, 1924, November 25, 1925, November 25, 1926, September 8, 1927, October 24, 1927, October 27, 1928, and November 9, 1928. The audits of September 8, 1927, and prior dates constitute practically all the evidence relating to the state of Warthen's accounts and his transactions as treasurer prior to September 8, 1927. Most of his books and practically all of his papers relating to those periods have been lost or destroyed; but the accountant who actually made the audits of October 20, 1924, and prior dates, testified that Warthen accepted those audits as correct statements of his accounts. In addition to the audits covering the periods after September 8, 1927, there is much other evidence in the record, though also many of the records and papers relating to his accounts and transactions during these later periods have been lost or destroyed. Among the more important records and papers relating to the later periods which are in the record are the following: (a) A day book beginning November 29, 1927, in which taxes collected by him were entered; but the evidence shows that not all the taxes collected on and after that date were entered therein. (b) Journals in which all warrants paid and other disbursements made by him for the account of the county and county school board are entered. In most instances the dates on which the warrants were issued are shown, but not the dates on which they were paid. (c) An incomplete collection of warrants and interest coupons paid by Warthen and of checks drawn on his bank accounts. (d) An incomplete collection of deposit slips showing certain deposits in bank made by him during the periods December 9-December 31, 1927, and during the period June 27-November 9, 1928. (e) The ledger sheets of the following accounts kept by Warthen in the Front Royal National Bank, of which he was president:

Sheets for the period May 9, 1927-May 3, 1928, of the account denominated first "A. L. Warthen, Personal Ac." and later "A. L. Warthen."

Sheets for the period December 24, 1926-November 7, 1927, of the account denominated "A. L. Warthen, Treas. Warren Co." This account was closed November 7, 1927.

The sheets carrying an account denominated "A. L. Warthen, Spl." This account was opened September 9, 1927, and practically closed September 28, 1927, there being left in it a balance of $1.

The sheets of a second account denominated "A. L. Warthen, Treas.," which was opened May 7, 1928, and closed January 1, 1929.

The sheets of a second account denominated "A. L. Warthen, Spl." which was opened May 23, 1928, and closed July 19, 1928, with an overdraft of $32.81.

The cashier of the Front Royal National Bank testified that the ledger sheets above listed were all the ledger sheets of Warthen's accounts which he had been able to find, and all the ledger sheets of all his bank accounts from May 9, 1927, to the time of his death.

The audit of August 15, 1923, was made before Warthen had received the tax assessments for 1923, and before the expiration of the time given him by statute in which to pay in money for 1922 tax tickets which had not been collected by him; and appears to be a correct statement of his accounts on that date.

The audit of October 20, 1924, was made after the expiration of the time given him by statute in which to pay in money for the 1923 tax tickets which he had not collected, and after the property tax assessments for 1924 should have come into his hands for collection. However, it is a reasonable inference from the evidence that the amount which he had collected at this time on the 1924 assessments was small, if anything, and we accept this audit as a correct statement of his accounts on October 20, 1924.

The audits of November 25, 1925 and November 25, 1926, are almost worthless. Each was made after Warthen had begun to collect the property tax asssessments for the current year and only a few days before the date on which the

five per cent penalty was added to unpaid tax tickets for that year. Notwithstanding this fact, the auditor does not charge him either with the assessments for that year, or with the money which he had collected on them; and he does not show whether the money Warthen had in hand, and/or in bank, had come from collections of the assessments for that year, or whether any of the warrants which he is credited with having paid had been paid from collections of that year's taxes. The most that can be said from either of these two audits is that, as of the date of the audit, Warthen did not owe the county *less* than is therein shown, while he probably owed it much more than is therein shown.

The audit of August 15, 1923, and the testimony as to how he kept his bank account show that on that date Warthen was accountable to the county for $66,512.29 (which amount included his liability for uncollected 1922 tax tickets); that in this amount was also included a charge against him of $10,037.00 for Happy Creek road bonds which had been sold, but for which he had not received the money at the time the audit was made; that he had on deposit to his account as treasurer $29,800.00; and that his liability to the county exceeded by $26,675.29 the sum of the Happy Creek road bond item and the money he had on deposit in bank.

The accountant who made this audit and Francis Jones (Warthen's deputy) both testify that on August 15, 1923, Warthen had on hand uncollected tax tickets sufficient to "balance" his account, *i. e.*, to the amount of $26,675.29; but they do not testify for what years these tickets were. All that the evidence discloses on this point is that the amount of 1922 tax tickets on hand August 15, 1923, did not exceed and were probably much less than $13,751.54,[20]

---

[20] An analysis of the audit of August 15, 1923, shows that Warthen reported to the accountant that he had collected all except $13,508.80 of the 1922 tax tickets prior to December 1, 1922. When the five per cent penalties (amounting to $675.74) are added to these tickets, and the tickets allowed him as delinquent ($433) are deducted, the result is $13,751.54. It is true that Jones testified that Warthen had a habit of reporting the taxes of some of his friends as having been

and that at the time of his death Warthen had on hand tax tickets for 1922 and prior years aggregating $2,222.29.

Francis Jones testified further: At the end of 1923 Warthen had in his hands "uncollected and enforceable bills due the county and cash sufficient to pay all that he owed the county of Warren." On January 1, 1924, he had on hand "somewhere from forty to fifty per cent of the 1923 bills, and he had bills from other years, and a good portion of the collections that he had deposited in the bank, some that he had collected on 1923 bills and the balance he had in his hands as treasurer of the various funds." Warthen had a fixed practice of reporting tax tickets of some of his friends as having been paid on or before November 1st, to avoid the five per cent penalty from being imposed on them, though they would not be paid until a later date; but when they were paid he deposited the money in bank to his account as treasurer. In February, 1924, Warthen was considering resigning his office and directed him (Jones) to make up a settlement of his accounts, which he did. At that time Warthen also had cash, money in bank, and uncollected tax tickets to an amount equal to his indebtedness to the county. He does not, however, testify for what years these uncollected tax tickets were.

Neither this audit nor any other evidence in the record is sufficient to establish that prior to January 1, 1924, Warthen was guilty of misappropriating any money actually received by him from the collection of the current revenue or from the collection of tax tickets for which he had not in fact fully settled. On the other hand, the evidence shows that prior to and for several years after August 15, 1923, Warthen was regarded as solvent and his credit was good; and that he had some income from sources other than the

---

paid on or before the date the penalty attached, though they would not be paid until later; but in the absence of evidence to the contrary it is not to be presumed that the State accountant in auditing his accounts permitted Warthen to include in tax tickets to which no penalties were added, tax tickets which he had in his hand uncollected at the time of the audit.

treasurership. But there is nothing specific in the evidence as to what property he had during that period, or what was the amount of his income from other sources.

The audit of October 20, 1924, and the testimony as to how he kept his bank account, show that on that date he was accountable to the county for $31,208.84, and had on deposit to his account as treasurer $4,000. The testimony of the accountant and of Deputy Treasurer Jones is that at this time Warthen had on hand uncollected tax tickets sufficient in amount "to balance" his accounts, that is, to the amount of $27,208.84; but it nowhere appears from the evidence for what years these uncollected tax tickets were. However, an analysis of this audit (made as indicated in note 20) shows that the amount of 1923 tax tickets which he had on hand on October 20, 1924, could not have exceeded $10,176.67, and probably amounted to much less.

The audit of November 25, 1925, would appear to show on its face that Warthen was accountable to the county as of that date for $31,855.12, had on deposit to his account as treasurer $13,475.99 and had in his possession "a warrant for interest paid by him for bonds amounting to $750." But for the reasons heretofore stated, this audit is worthless in so far as it purports to show the amount for which on that date Warthen was accountable to the county over and above the amount he had in bank and the warrant in hand. The most that it can be said to show is that at that time he was accountable to the county for *not less* than $31,855.-12, while his indebtedness was probably much greater; and that against his indebtedness, *whatever it was,* he had in bank only $13,475.99 and in his hands a warrant for $750.

The testimony of both the accountant and Deputy Treasurer Jones is to the effect that Warthen had on hand at this time uncollected tax tickets for years prior to 1925 aggregating as much as $17,629.15; but again they do not give the years for which these tax tickets were. However, an analysis of this audit would appear to show that the

1924 tax tickets which he then had on hand could not have exceeded $9,509.46, and probably amounted to much less.

The most that the audit of November 25, 1926, can be said to show is that on that date Warthen was accountable to the county for *not less* than $27,888.38, though it was probably much more, and that he had on hand and on deposit in bank to his account as treasurer against his indebtedness (*whatever it was*) only $18,746.55. An analysis of this audit would appear to show that the 1925 tax tickets which he then had on hand could not have exceeded $7,486.32, and were probably materially less than that amount.

The audit of September 8, 1927, was made before the tax assessments for 1927 had come into Warthen's hands, and before the expiration of the time given him by statute in which to pay in money for the uncollected 1926 tax tickets. At the time it was made the list of delinquent 1926 tax tickets had not been acted upon.[21]

This audit shows that as of September 8, 1927, Warthen was accountable to the county for $55,601.84 (subject to be reduced by the amount of 1926 tax tickets which should be allowed to him as delinquent). It is to be noted, however, that in this audit Warthen was allowed credit for having paid two county warrants for $9,500 and $9,420.38, respectively, both drawn payable to Motley Construction Company and containing the words "charge to county school fund for 1927." Though these warrants were not actually paid until later (they were charged against his bank account denominated "A. L. Warthen, Spl." on September 12), the testimony of the accountant is that on September 9 Warthen produced these warrants before him, and that he stamped them as paid and included them in the audit, as if they had been paid on or before the 8th.

With reference to the money which Warthen had in bank on September 8, 1927, the report of the State Accountant

---

[21] It appears from the supplemental audit of October 24, 1927, that the total amount of delinquents finally allowed him (plus the five per cent penalty) amounted to $369.67.

reads: "Statement from his depository, the Front Royal National Bank, shows that there was on deposit to the credit of the treasurer as of September 8, 1927, the sum of $10,895.44." However, the certificate which was actually made by the cashier, which was produced by the assistant of the State Accountant and introduced as a part of his evidence, reads: "I, H. R. Miller, cashier of the Front Royal National Bank, Front Royal, Virginia, certify that, according to the records of this bank, the following stands to the credit of A. L. Warthen, treasurer of Warren county, as of September —, 1927. A. L. Warthen Special Account, drawing, $128.45, and A. L. Warthen, tax account, $187.37, and A. L. Warthen, Special Account, deposit ticket dated September 8, 1927—but will not be shown on books until September 9, 1927—$10,579.62, making a total of $10,-895.44."

The ledger sheets of all acounts which Warthen had with the Front Royal National Bank during 1927 and 1928, were introduced in evidence. An examination of these sheets show that on September 8, 1927, Warthen had only two accounts in this bank—(1) an account denominated "A. L. Warthen, Treas. Warren Co." which was overdrawn $1,182.40, and (2) an account denominated "A. L. Warthen, Personal Ac." in which he had a credit balance of $40.93. On September 8 he opened a third account denominated "A. L. Warthen, Spl.," and made two deposits to it, one of $128.45 and the other of $20,000, but these deposits were not entered on the bank's ledger sheet until the 9th. These were the only two deposits which were at any time made to this account. The $128.45 was a transfer of that amount by check, or otherwise, from the account of "A. L. Warthen, Treas. Warren Co." which increased the overdraft of that account to $1,310.85. The $20,000 was a personal loan which Warthen had procured from the State and City Bank of Richmond, Virginia, on a note endorsed by a number of his friends. However, when the $20,000 deposit was made on the 8th Warthen

instructed the bank to pay, or it did pay, the Motley Construction Company warrant for $9,420.38, though it did not charge this item on its ledger against Warthen until the 12th. In making his report, the cashier of the bank reported as in bank to the credit of "A. L. Warthen, Special Account," (1) the deposit of $128.45 and (2) the deposit of $20,000 less the item of $9,420.38 (*i. e.*, $10,579.62). He also reported an item of $187.37 to the credit of "A. L. Warthen, Tax Account," but no such account is carried on any of the bank's ledger sheets, nor have we been able to ascertain from the record anything further about it. But it is to be noted that the cashier made no mention of the fact that the account of "A. L. Warthen, Treas. Warren County" was overdrawn at the time he made his certificate $1,310.85.

On September 12 the other Motley Construction Company warrant for $9,500, or a check therefor, was charged against "A. L. Warthen, Spl." account, though the warrant must have been paid, or a check given therefor, on September 8 or 9, as Warthen on the 9th presented this warrant to the accountant as having been paid by him. In the light of these facts, the Auditor should either not have included the $9,500 warrant in his audit, or should have reported the money on deposit as being only $1,395.44 according to the cashier's certificate. But even this would have been incorrect because of the fact that Warthen's account as treasurer was overdrawn $1,310.85. Treating the two Motley Construction Company warrants as paid, Warthen cannot be said to have had in bank against his indebtedness to the county but $84.59.

There is nothing in the evidence to show what amount of uncollected tax tickets for 1926 and prior years Warthen had on hand on September 8, 1927, or when the supplemental audit of October 24, 1927, was made other than these facts. At the time of his death he had on hand tax tickets for 1922 and prior years aggregating $2,222.29, and tax tickets for the years 1923-1926, aggregating $7,-

049.30. An analysis of the audit shows that Warthen reported $77,187.06 of the 1926 tax tickets as having been paid prior to December 15, 1926. This left only $9,095.60 which was not reported as paid. Adding to these the five per cent penalty ($454.78) and deducting the delinquent taxes and penalty subsequently allowed him ($369.76) leaves at most $9,180.62 of uncollected 1926 tax tickets which were in his hands on September 8, 1927, which were not subsequently allowed as delinquent and credited to him. The reasonable inference, however, is that the amount of 1926 tax tickets on hand on October 24, 1927, was much less than $9,180.62.

Upon analysis of the audit of September 8, 1927, in the light of the evidence heretofore recited, it is impossible to escape the conclusion that during the period covered by it, Warthen was guilty of the misappropriation of large sums of money belonging to the county which actually had been received by him, and for which he was accountable as a special bailee. He may have been guilty of such misappropriations prior to this period, and the evidence raises a strong suspicion that he was; but it is insufficient to establish it as a fact.

Before considering the subsequent audits it is appropriate here to refer to certain transactions which took place during the period covered by the audit of September 8, 1927, but which have a history extending into later periods.

On or about March 26, 1927, Warthen procured a loan of $7,000 from the Commercial National Bank of Washington, D. C., upon a note dated March 26, 1927, drawn by Kenneth N. Gilpin, endorsed by Warthen, but of which Warthen was in fact the maker and Gilpin the endorser.

On March 31, 1927, Warthen deposited $7,000 in the Front Royal National Bank to the account "A. L. Warthen, Treas. Warren Co.," which account had been continuously heavily overdrawn since February 12, 1927, and was overdrawn $2,702.97 when this deposit was made. In the light

of the other evidence in the record the fair inference is that this deposit was the money borrowed from the Commercial National Bank, and that it was used in part to pay county warrants and in part to take up an overdraft caused by the payment of county warants for Warthen by the bank.

This note matured on July 25, 1927, when it was renewed by a note of the same parties for the same amount, which matured on November 25, 1927. The renewal remained overdue until December 13, 1927, when it was paid by Warthen, the amount paid, with accrued interest, being $7,011.67. It was paid through the Front Royal National Bank by either it, or a check therefor, being charged against the account "A. L. Warthen, Personal Ac."

Some time prior to May 20, 1927, probably in February, 1927, Warthen paid off $5,000 of "Warren county four per cent bonds of 1933." There is no direct evidence as to from what money he paid these bonds, but the fair inference from the evidence bearing on the point is that they were paid from money in his hands belonging to the county. However, he did not cancel these bonds; and on or about May 20, 1927, he pledged them as collateral on his personal note for $4,000, dated May 20, 1927, upon which he secured a loan from the Continental Trust Company of Washington, D. C. On May 20, 1927, Warthen deposited in the Front Royal National Bank to his account denominated "A. L. Warthen, Personal Ac." $3,940.00, which is $4,000 less three months' discount at six per cent. The fair inference is that this was the proceeds of the discount of the $4,000 note above mentioned. At the time of this deposit this account was overdrawn $84.10, and on the day the $3,940 deposit was made (May 20) there is a check, or other withdrawal, for $2,500 charged against this account.

Warthen's son, who negotiated this loan for him, testifies that the money was borrowed for the purpose of paying county warrants. If it was so used, or to the extent that

it was so used, Warthen received credit therefor in the audit of September 8, 1927, by being credited with the payments made therefrom. To the extent that it was not used he is not entitled to any credit therefor. Therefore, it is not necessary for the purposes of this case to pursue the inquiry as to whether it was or was not used to pay county warrants.

When this note matured on August 18, 1927, it was renewed until November 16, 1927, and was finally paid on December 9, 1927, the amount, with accrued interest, being $4,013.33. It was paid through the Front Royal National Bank by it (or a check therefor) being charged against the account "A. L. Warthen, Personal Ac."

Though these $5,000 of bonds were held by the bank as collateral on his personal note, Warthen, without disclosing this fact, made the claim that he was entitled to credit in the audit of September 8, 1927, for the payment thereof. This the auditor very properly refused because Warthen had not produced the bonds so that they might be stamped paid.

On December 6, 1927, Warthen procured a warrant which is listed on his warrant book as payable to the Bank of Warren and charged to the account "County Sinking Fund"; and in the audit of October 27, 1928, he is credited under the account "County Sinking Fund" with "five bonds retired wt A. E. Warthen, Treas. $5,000." The only fair inference from the record is that this warrant was issued to Warthen or to the Bank of Warren for him in payment of the $5,000 of bonds above mentioned; and that he paid the warrants by paying the note on which he had pledged them as collateral.

One of the contentions of Aetna Casualty and Surety Company is that Warthen should have been credited with the payment of these bonds during the period covered by the audit of September 8, 1927. The court in its decree refused to credit either the whole or any part of the payment of these bonds as having been made during the pe-

riod covered by that audit. What he actually did was to pay $1,000 of the $5,000 during the period covered by the audit of September 8, 1927, and $4,000 during the period October 24-December 31, 1927, and we shall so credit the payment of them. When so treated the payment of the principal of the above note ($4,000) becomes the payment of the $4,000 paid on these bonds; and one, but not both of these items, is a proper credit to Warthen.

On September 7, 1927, Warthen executed a note for $20,000 payable three months after date to his own order, which was endorsed by him, Anna H. Warthen, and twenty of his friends, and upon this note he procured a loan of $20,000 from the State and City Bank and Trust Company of Richmond, Virginia. This note, plus past due interest (a total of $20,021.96) was paid by Warthen on December 13, 1927, apparently by a check which was charged to the account "A. L. Warthen, Personal Ac." on December 16, 1927.

The $20,000 procured from this loan was deposited on September 9, 1927, in the Front Royal National Bank to his account denominated "A. L. Warthen, Spl."; and out of this deposit were paid the two warrants for $9,500 and $9,428.38 drawn payable to Motley Construction Company heretofore mentioned. There is testimony in the record that the residue of this $20,000 was also applied by Warthen between September 12 and 28 to the payment of county warrants, but the evidence does not show what specific warrants were so paid.

The $7,000 and $20,000 notes were Warthen's personal notes, and the money borrowed thereon was his personal money unless and until turned over by him to himself in his official capacity or applied to the payment of warrants drawn by the county. When on March 31, 1927, he deposited the $7,000 he had borrowed to his account as treasurer, this was a turning of it over to himself in his official capacity. When he paid county warrants with the proceeds of the $20,000 loan this was an application thereof

to the payment of sums due by him to the county. But the fact that he had applied the money he had personally borrowed on these two notes to the payment of the sums which he owed the county, did not give him any right thereafter to repay these personal loans out of money belonging to the county which was in his hands as treasurer. If he did so (and it will hereafter appear that he did so), he misappropriated the money so used by him on the dates that he paid these notes.

As of October 24, 1927, the State Accountant made a supplemental audit of Warthen's accounts. This audit was made after the list of delinquent 1926 tax tickets had been made out and allowed, but before the property tax assessments for 1927 had come into his hands. It shows that as of that date Warthen was accountable to the county for $53,833.74, and that at that time he had no money on hand or on deposit in bank to his account as treasurer. The report of the State Accountant has this to say on the subject: "In the absence of Mr. Warthen, my representative visited both local banks and was informed that no funds were on deposit to the credit of A. L. Warthen, treasurer. Mr. Jones, Mr. Warthen's clerk, also made statement that as far as he knew there were no funds on deposit in any bank to the treasurer's credit, and that he held no cash in office." The representative of the State Accountant who actually made the audit testified that this statement in the audit was in accordance with the facts; and that though he tried to see Warthen while he was there making this audit, he was unable to see him.

The ledger sheets of Warthen's bank accounts show that on October 24, 1927, the standing of his several accounts was as follows: "A. L. Warthen, Treas. of Warren Co." credit balance of $8.06, "A. L. Warthen, Spl." credit balance of $1.00, "A. L. Warthen, Personal Ac." credit balance of $0.93.

As has been said, on October 31, 1927, the court suspended its order removing Warthen from office; and he

thereafter recieved the 1927 tax assessments and proceeded to collect them and to otherwise act as treasurer until he entered upon his new term on January 1, 1928.

During the period October 24-31, 1927, Warthen received no money belonging to the county, except perhaps a small amount from the collection of tax tickets for prior fiscal years which were in his hands; and his deputy testifies that all sums received by him during the period September 13th-October 31st, did not exceed $75. In the state of the evidence we shall treat the receipts during this period as negligible and take no account thereof.

On November 3, 1927, Warthen deposited $2,000 to the account "A. L. Warthen, Treas. Warren Co." No cognizance is taken by counsel, the commissioner, or the court of this $2,000 item. The record definitely shows that $384.75 of this item was used on or after that date to pay county warrants, and in the absence of any evidence to the contrary the fair inference is that all of it was so used. In this connection it is to be noted that on November 1 the semi-annual interest coupons on a large amount of the county's road bonds became due, and that between November 1st and November 21st, Warthen had no other funds in bank from which he could have paid these coupons when presented.

There is no direct evidence as to the source from which this $2,000 came; but there was no such sum from current revenues which should have come into his hands either for the county or the State during the period October 24-November 3, 1927. He had not at that time begun to receive the 1927 taxes and levies. The only fair inference is that it was procured by Warthen from some personal source.[22] The deposit of this amount to his account as treasurer constituted a payment thereof to himself as treasurer, to be applied as payment on his *then* existing obliga-

[22] On November 22, 1927, Warthen's account with the Front Royal National Bank is charged with an item of $2,000. This was not a payment made on account of the county or a remittance to the State; and it is not improbable that the $2,000 deposit of November 3rd mentioned in the text was a temporary personal loan procured by Warthen and repaid on November 22, 1927.

tions, which so far as the record shows had all occurred prior to October 24, 1927. We, therefore, shall treat this $2,000 as a personal payment by Warthen on his obligations existing on October 24, 1927, and include it in the amount of money belonging to the county which came into his hands during the period October 31-December 31, 1927.

No audit was made of Warthen's accounts as of the end of his term on December 31, 1927; but when the evidence is carefully analyzed his receipts and disbursements for the account of the county and State during the period October 31-December 31, 1927, can be determined to a close approximation.

The evidence shows no receipts or disbursements in the period October 24-31, 1927; and we shall treat the period October 24th-December 31st as coincident with October 31st-December 31st.

During the period October 31-December 31, 1927, Warthen received $72,422.10 for the account of the county and the State for which he became accountable as a special bailee. This sum was received from the following sources: (1) $43,047.73 was collections of 1927 State taxes and county levies which were entered by him on his day book; (2) $16,294.53 was the 1927 county levies paid by the Norfolk and Western Railway Company; (3) $10,822.99 was remittances from the State treasury for the account of the county; (4) $256.85 was received from the sale of produce and charges for labor; (5) $2,000 was the amount he paid to himself as treasurer on or about November 3, 1927, which we have above mentioned.

Items 2-5 were exclusively county funds. Item 1 included collections of both county levies and State taxes. It is not possible to determine from the evidence the exact amounts of county and State funds, respectively, included in this item, but the amount of each can be determined approximately. For the purposes of this case we shall accept these approximations, and others, in lieu of, and treat them as though they were, the exact amounts.

The total of the 1927 State capitation, property, and income taxes assessed (excluding omitted capitation taxes assessed in 1927) was $10,830.76, exclusive of penalties. Of this amount $2,190.50 (exclusive of penalties) was allowed Warthen as delinquent, leaving only $8,640.26 which was collected by Warthen at any time. The regular 1927 capitation taxes assessed amounted to $5,281.50, and the number of persons assessed therewith to 3,521. When the number of persons who are entered on Warthen's day book as having paid their 1927 taxes prior to January 1, 1928, is taken into account, even if it be assumed that all delinquents allowed him were capitation taxes, there was $1,700, at least, of the 1927 capitation taxes which had not been collected prior to January 1. This reduces the maximum amount of 1927 State taxes which could have been collected prior to January 1, to $6,940.26. On January 26 and February 7, 1928, Warthen remitted to the State Treasurer $69.77 and $258.98, respectively, in settlement of omitted capitation taxes assessed in 1927; and on February 29 he remitted $5,789.56 in payment of other 1927 State taxes collected by him. All the omitted capitation taxes remitted for were doubtless paid prior to October 31, 1927, and we shall treat them as having been so collected. In view of the provisions of section 2410 (as amended by Acts 1926, page 313, chapter 170) and section 2412 of the Code of Virginia with reference to reports of and settlements by county treasurers, it is reasonable to infer that the remittance of $5,789.56 on February 29 represented the amount of 1927 State taxes which had been collected by Warthen up to and including September 15, 1927. This is further substantiated by the fact that the amount of penalties on 1927 State taxes finally charged against Warthen was $250. It thus appears that the amount of State taxes collected by Warthen October 31-December 31, 1927, was between $5,789.56 and $6,877.05. Considering the volume of 1927 tax collections made by Warthen between December 15 and January 1, and the nature of the subjects

assessed for State taxation, it is reasonable to infer that the mean between these two figures, $6,364.91, is a reasonably close approximation of the amount of State taxes which are included in item 1. (However, due to an error in computations this mean was originally determined by us as $6,333.80. This error was not caught by us until after all the succeeding computations had been made and we have not deemed it of sufficient importance to require a revision of those computations.)

Accepting $6,333.80 as the amount of State taxes collected October 31-December 31, 1927, the amount of the 1927 county levies collected during that period is $53,008.46. The total of the 1927 county levies assessed (exclusive of penalties) was $85,687.07. Of this amount $624.41[23] was allowed as delinquent, and at the time of his death Warthen had on hand 1927 tax tickets aggregating $6,849.23.[24] Deducting these two items it is seen that the total of the 1927 county levies which were collected by Warthen at any time prior to November 9, 1928, amounted to $78,213.43, and that the amount thereof collected after December 31, 1927, was $25,204.97, or, including penalties, $25,301.87. Stated in percentages Warthen collected 61.863 per centum of the 1927 county levies prior to January 1, and 29.415 per centum on and after that date.

In the audits covering the period October 31, 1927-November 9, 1928, the Auditor has charged Warthen with penalties on 1927 county levies aggregating only $470.89. This is a smaller amount than he should have been charged with; but, it has been agreed by the parties to this litigation that this audit shall be considered as correctly stating the total principal amount due by Warthen and his sureties at the time of his death, and we have made no change in the sum charged against him for penalties on 1927 levies. The penalties on the county levies represented by the 1927 tax tickets subsequently allowed as delinquent and on those

[23] Including penalties this figure is $655.63.
[24] Including penalties, $7,191.68.

which he had on hand at the time of his death amounted to $31.22 and $342.46, respectively. Deducting these two figures from $470.89 in the final analysis, Warthen has been charged with penalties on county levies collected by him aggregating only $97.21. All this we shall treat as having been collected after January 1, 1928.

In the audits of October 27th and November 9, 1928, Warthen is credited with having paid for the county during the period October 24, 1927-November 9, 1928, warrants and interest coupons amounting to $118,343.61; but the Auditor has not so segregated them as to show the amount paid prior to January 1, 1928. The warrants with which he is credited as having paid during the period October 24, 1927-October 27, 1928, are listed in his warrant book, which, though it does not give the dates upon which they were paid, gives the dates upon which they were issued.[25] The warrants issued prior to January 1, 1928, which were paid by Warthen at any time during the period October 24, 1927-November 9, 1928, amount to $42,983.86. He is also credited with having paid during the period October 24, 1927-October 27, 1928, interest coupons which fell due on or before December 1, 1927, aggregating $2,795. These two items, totaling $45,778.86, represent the maximum amount of warrants and interest coupons which Warthen could have paid for the county during the period October 31-December 31, 1927; but the evidence shows that not all the warrants and interest coupons included in this total were paid during that period.

The evidence either definitely establishes, or strongly warrants the inference, that the following items aggregating $6,067.97 (all which are included in the total $42,983.-86), were not paid during that period:

---

[25] Only the number of the warrants charged against the county school fund is given; but the records of the clerk of the school board are in evidence, and the dates of the warrants issued prior to July 31, 1928, are given in those records. Also from them the approximate dates of warrants issued after June 30, 1928, can be ascertained.

(1) A warrant dated August 3, 1927, for $550 drawn on the Cedarville District Road Fund is stamped by the bank as having been paid on December 31, 1927. But it is not charged to Warthen's account until on January 3, 1928, and was paid out of the $958.09 balance to Warthen's credit at the end of business on December 31, or out of the deposit made by him on January 3, 1928. If it is treated as having been paid on December 31, his bank balance as of the close of business on that day must be correspondingly reduced. For purposes of simplicity we shall treat it as not having been paid until on or after January 1, 1928.

(2) Three warrants for $58.90, $63.11 and $67.32 for December salaries issued to school teachers are shown by his bank account to have been paid, after January 1, 1928 —two on January 5th and the other on January 12th.

(3) The endorsements on eight school warrants (numbers 117, 122, 123, 131, 133-136) aggregating $365.85, and a warrant for $2.60 drawn to W. C. Weaver on the county fund show that they were not paid until after January 1, 1928.

(4) A warrant issued December 30, 1927, on the South River District Road Fund for $14.40 was not paid until January 4, 1928.

(5) School warrant Number 121, dated December 17, 1927, is drawn payable to Warren-Rappahannock Trust Company, and has on the face thereof "For note." This is the only item for $3,900 for which a warrant is listed as having been drawn, or as having been paid by Warthen, during the period October 24, 1927-November 9, 1928. At no time from December 16, 1927, to January 13, 1928, did Warthen have on deposit in bank a sum sufficient to pay this warrant. On January 13, 1928, he received a remittance of school funds amounting to $3,992.80, from the State Treasurer, and deposited it to his account ("A. L. Warthen") in the Front Royal National Bank; and on that day an item of $3,900 is charged against this account. The

inference is plain that this item was school warrant number 121, or a check given by Warthen in payment thereof.

(6) On January 5, 1928, the warrant for $5 drawn on the county fund to W. C. Mauck, dated December 6th, was paid by the application thereof to his taxes.

(7) The day book records that on January 14th the taxes of Elmer Boyd amounting to $49.79 were paid "by warrant S. D. Boyd." No warrants were issued to S. D. Boyd between December 31st and January 14th. The inference is that in this way this amount was paid to S. D. Boyd on January 14th on account of one of the warrants issued to him which is included in the total $42,983.86 above mentioned. When or in what way the residue of the warrant was paid does not appear.

(8) A warrant for $5,000, dated December 6, 1927, was issued to A. L. Warthen for the redemption of $5,000 of county bonds. These were evidently the bonds for which Warthen had paid with county funds prior to May 20, 1927, and had afterwards taken and pledged as collateral security on his personal note for $4,000. This warrant was paid by paying this note, in order to secure the bonds for cancellation. The amount paid, principal and interest, was $4,013.33. Of the item represented by this warrant $1,000 should be treated as having been paid during the period covered by the audit of September 8, 1927, and only $4,000 as having been paid during the period October 31-December 31, 1927.

The evidence does not show beyond contravention that, excepting the items aggregating $6,067.97 above mentioned, all other items included in the figure $45,778.86 were paid prior to January 1, 1928. But the fair inference from the evidence is that substantially all of them were; and for the purposes of this case we accept $39,710.89 as the amount paid by Warthen for the account of the county during the period October 31-December 31, 1927. The amount may have been a little less than this, but it was not more than this.

In this connection it may be noted that when the several warrants and interest coupons included in the figure $39,-710.89 are compared with the items charged against Warthen's bank accounts during that period, items aggregating $26,092.94 can be identified with reasonable certainty as having been paid by charges against those accounts prior to January 1, 1928. Also the following payments on warrants were made by applying a part of the warrant to the payment of tax tickets: S. W. Thompson, $25.09; S. D. Boyd, $311.10; Henry Cooper, $7.98. He also paid a check of December 16, 1927, for $331.81 making a remittance to the State Auditor. This makes a total of $26,769.01 which can be pointed out definitely as having been paid by him for the county and State prior to January 1, 1928. During December, 1927, Warthen had sufficient funds in bank to have paid any of the warrants or coupons included in the $39,710.89 upon presentation to him; and there are a number of other charges against his bank accounts which doubtless represent payments of warrants or coupons, though they cannot definitely be identified as such. In addition to this, as will hereafter appear, about $7,970.08 of the money collected or received by Warthen for the account of the county and the State during the period October 31-December 31, 1927, was not deposited in bank during that period; and it is probable that most of it was used to pay warrants presented to him during December while he was engaged in the collection of taxes.

There are included in the record (1) an incomplete collection of the warrants issued prior to January 1, 1928, which were paid at some time by Warthen, (2) a number of checks drawn by Warthen which were paid prior to January 1, 1928, and (3) certain interest coupons which fell due prior to January 1, 1928. Francis Jones, Warthen's deputy, gives their total as $60,035.98. He further testifies that this sum plus a warrant of $5,000 for the redemption of county bonds and $4,013.33 paid by him to take up his $4,000 note heretofore mentioned (which he states, makes

a total of $69,065.98), is the amount paid out by Warthen for the account of the county during the period October 24-December 31, 1927. But his adding machine slips show errors which, when corrected, give these figures as $60,-066.17 and $69,079.50, respectively. However, upon analysis, this testimony is shown to be so inaccurate as to have no probative value.

In these figures Jones has improperly included the following items: (1) He has included the items aggregating $6,067.97 above mentioned as having been paid either before October 24, 1927, or after January 1, 1928. (2) He has included the two school warrants for $9,420.38 and $9,500 drawn to Motley Construction Company which were paid September 8-12, 1927, and were credited to Warthen in the audit made as of September 8, 1927. (3) At least $5,402.25 of the aggregate amount of the checks included in his totals were checks which were issued in payments of warrants which are also included. (4) A check of $331.81 dated December 16, 1927, drawn to C. Lee Moore, Auditor, is included. By process of elimination this check is found to be a payment to the State on account of indebtedness to the State existing prior to October 31, 1927. (5) As has been noted, the item of $4,013.33 was paid to take up the personal note of Warthen on which he had pledged the $5,000 of county bonds which he had redeemed with county funds. He is not entitled to any credit for this item, and elsewhere has been given full credit for the bonds redeemed. When these corrections are made Jones's total is reduced to $34,343.76. But on the other hand, his total does not include some warrants issued prior to December 31, 1927, which the evidence affirmatively shows were paid during the period October 24-December 31, 1927.

The figure $39,710.89, above given, does not include any allowance to Warthen for commissions. Clearly, a treasurer is not entitled to apply money collected by him for the county or State to pay to himself commissions on sums which he has not collected or settled for; and commissions

on sums not collected by him should not be allowed as disbursements against money actually received. The commissions to which Warthen was entitled on account of the $64,088.30 collected or received by him for the county from current revenues during the period October 31-December 31, 1927, amounted to $2,478.64, and on the $6,333.80 collected by him during that period for the account of the State amounted to $316.69. However, the commissions on collections for the State cannot properly be considered as disbursements made by him for the reason that he was required by law to remit the whole amount collected to the State Treasurer, who in turn was required to remit to him for his commissions. During this period Warthen made no remittance to the State Treasurer on account of the collection of 1927 tax tickets. The State Treasurer remitted to Warthen his commissions on collections of 1927 tax tickets by checks of $307.98 and $325 sent Warthen about February 7th and June 29, 1928. If it is considered that he properly paid to himself his commissions on the moneys received by him for the county during this period, the total of the payments made by him for the account of the county during the period October 31-December 31, 1927, was $42,521.34.

On October 31, 1927, Warthen had an aggregate balance to his credit in his two bank accounts of $8.99. During the period October 31-December 31, 1927, he deposited to the account "A. L. Warthen, Personal Ac." a total of $68,-164.07, and to the account "A. L. Warthen, Treas. of Warren Co." one item of $2,000, which last item, as we have said, must have come from some personal source.

Of the deposits made to "A. L. Warthen, Personal Ac." the evidence definitely establishes that $39,868.50 was money collected from current revenues; and the reasonable inference is that $22,576.67 of the remainder was money collected from current revenues. Items aggregating $4,225 are positively identified as money which came from some personal source, and the reasonable inference is that other

items aggregating $800 were received from personal sources. The evidence affords no information as to whether the residue of the deposits to this account ($693.90) came from official or personal sources; but for the purpose of this case we shall treat them as coming from personal sources. We find, then, that $62,445.17 of the money deposited to the account "A. L. Warthen, Personal Ac." was received by him for the account of the county and State, and shall treat the other $5,718.90 as having come from personal sources. This leaves $7,976.93 of the money received by Warthen for the account of the county and State which was not deposited in bank.

At the close of business on December 31, 1927, Warthen had a credit balance of $958.09 to the account of "A. L. Warthen, Personal Ac.," which was the only account he then had. At the close of business on December 31, 1927, Warthen probably had on hand some of the funds which he had theretofore collected; but there is nothing in the record which warrants the inference or assumption that the funds he had on hand (i. e. undeposited) at the end of December 31, exceeded $1,740.22, and they may have been materially less. This is the amount gotten by taking the aggregate of the deposits made by him January 1-5 ($3,090.29) and deducting from it the total of the collections made by him January 1st-5th, which is $1,350.07. For the purpose of this case we find $1,740.22 to be the amount which he had on hand, and that it and the balance in bank, making a total of $2,698.31, constitute all the money (or its equivalent in checks) which Warthen, as outgoing treasurer, transferred to himself, as incoming treasurer, on January 1, 1928, the whole of which may be properly treated as having come from collections of 1927 tax tickets.

From the facts above stated it appears that during the period October 31-December 31, 1927, of the money actually received by him for the account of the county and State, Warthen misappropriated and applied to personal uses not less than $27,202.45:

Amount received for county and State.........$72,422.10
Amount disbursed for county and State including
 commissions on county receipts........... 42,521.34

 $29,900.76
Less money in bank and on hand turned over to
 himself January 1, 1928.................. 2,698.31

Total net misappropriations to personal uses....$27,202.45

In addition to these misappropriations of official funds to personal uses, in two instances, at least, Warthen misapplied collections of current revenues to the payment of items which were payable out of the balance due by him on October 31st and not out of collections from current revenues (1) He received, during the period October 31-December 31, 1927, only $1,993.23[26] for ·the account of the county sinking fund; but he paid items chargeable against this fund amounting (including his commissions) to $4,-254.70, and had on hand from the collections made the latter part of December the net amount of $87.95. That is, he had used $2,349.42 which belonged to other funds to pay sinking fund obligations, when it was his duty to have supplied this amount from personal funds placed by him in his hands towards meeting his indebtedness to the county sinking fund which had accrued prior to October 31, 1927. (2) He used $331.81 of the money collected for the State on 1927 tax tickets to pay to the State an indebtedness accrued prior to October 31st for sums due it for the collection of other taxes. It was not permissible for him thus to shift the burden of his defalcations from the shoulders of his bondsmen at the time the defalcations occurred to those of his bondsmen for a later period. In considering the liabilities as between his several sets of bondsmen, adjust-

---

[26] 61.863 per cent of $3,222.02, the 1927 county levies allocated to the county sinking fund.

ments must be made in his accounts to correct for these misapplications of funds as between accounts.

That Warthen's misappropriation of funds during the period October 31-December 31, 1927, amounted to, at least, $27,202.45 is shown also by the following facts.

The evidence either establishes or strongly supports the inference that all money deposited to the account "A. L. Warthen" during the period October 31-December 18, 1927, was money collected or received for the account of the county and State, except four items aggregating $3,200. During that period four items totaling $33,046.96, which were not payments for or on account of the county or State, were paid by checks drawn on, or charges made against, this account—(1) November 22, $2,000; (2) December 8, $4,013.33; (3) December 13, $7,011.67 and (4) December 16, $20,021.96.

The evidence does not show for what or to whom the $2,000 payment was made, but it repels any inference that this was a payment made for the account of either the county or the State. It further shows, conclusively, that this $2,000 was paid out of remittances by the State Treasurer for the account of the county amounting to $8,599.33, which were deposited on November 22, 1927. The other items were payments of the personal notes of Warthen for $4,000, $7,000 and $20,000 which have been heretofore mentioned. There may have been other payments of personal items which were made by checks on or charges against this account, but if so, they were not large items, and in the incomplete state of the evidence it is not possible to identify them.

The commissions to which Warthen was entitled on amounts collected for the account of the county during the period October 31-December 16, 1927, amounted to approximately $2,384.79. Treating these commissions as personal funds properly available for the payment of personal obligations, the evidence shows that, in paying the four items above mentioned from funds deposited to their ac-

count, Warthen misappropriated $27,462.17 which actually had been received by him for the account of the county and the State. However, $259.72 may have been later repaid, and we accept $27,202.45 as the amount of Warthen's misappropriation of county and State funds to personal uses during the period October 31-December 31, 1927, as established by the evidence.

It is not possible to determine with accuracy the respective amounts of State money and county money which are included in the $27,202.45 he misappropriated to personal uses or in the $2,698.31 which he turned over to himself on January 1; but these amounts can be approximated. The amount of State funds included in the total of those two items were approximately $6,338.80. Upon consideration of all the evidence bearing on this point which has come to our attention, it would seem to be fair to all parties concerned to treat $5,789.56 as being the misappropriation and misapplication of State funds made by Warthen October 31-December 31, 1927, and $544.24 of the $2,698.31 he turned over to himself at the beginning of his term as State funds. But it is to be borne in mind that $331.81 of the $5,789.56 was the use of collections of 1927 State taxes to remit for the balance due by him for collections which he had made of other State taxes prior to October 31, 1927. Therefore, for the purposes of this suit the item of $331.81 should be treated as remaining unpaid on January 1, 1928, and the misappropriation of State funds regarded as $5,-789.56 less $331.81. An analysis of the evidence also shows that the fair inference is that all of the $2,698.31 came from the collection of 1927 tax tickets; and that the portion of it which came from county levies was divided approximately as follows: Schools forty-seven per cent, county sinking fund 3.76 per cent, all other county funds 49.24 per cent.

Accepting, for the purposes of this case, the approximations given in the last paragraph above as being true amounts and percentages, and taking 61.863 per cent of the

total 1927 levies apportioned to each account as the amount collected for that account from the 1927 levies during the period October 31-December 31, 1927, not taking into account the two misappropriations between funds, we find that, excluding his liability for uncollected tax tickets, on January 1, 1928, Warthen was indebted to the several county accounts and to the State, over and above all sums turned over to himself on January 1, 1928, in the amounts shown in column 8 of Table 1.

TABLE 1

| COUNTY | 1 Balance Due October 31, 1927 | 2 Receipts October 31-December 31, 1927 | 3 Total of Columns 1 and 2 | 4 Disbursements Other Than Commissions October 31-December 31, 1927 | 5 Commissions on Receipts October 31-December 31, 1927 | 6 Turned Over to Self January 1, 1928 | 7 Total of Columns 4, 5 and 6 | 8 Balance Due January 1, 1928, in Excess of Sums Turned Over to Self |
|---|---|---|---|---|---|---|---|---|
| School Funds | $1,399 75 | $31,915 42 | $33,315 17 | $16,709 92 | $1,191 22 | $1,002 41 | $18,903 55 | $14,411 62 |
| County Sinking Fund | *18,516 79 | 1,993 23 | 20,510 02 | 4,165 00 | 89 70 | 87 95 | $4,342 65 | 16,167 37 |
| Gas Tax Fund | | 2,341 89 | 2,341 89 | 2,000 00 | 5 85 | None | 2,005 85 | 336 04 |
| Dog Tax Fund | 741 23 | 131 60 | 872 83 | 104 20 | 1 32 | None | 105 52 | 767 31 |
| Other County Funds | †30,175 97 | †29,706 16 | 59,882 13 | 16,731 77 | 1,190 55 | 1,063 71 | 18,986 03 | 40,896 10 |
| State | $50,833 74 ¶668.01 | $66,088 30 6,333 80 | 116,922 04 7,001 81 | $39,710 89 #331 81 | $2,478 64 | ¶¶2,154 07 544 24 | $44,343 60 876 05 | $72,578 44 6,125 76 |
| Total County and State | $51,501 75 | $72,422 10 | $123,923 85 | $40,042 70 | $2,478 64 | $2,698 31 | $45,219 65 | $78,704 20 |

*$19,516.79 less adjustment for $1,000 paid on bonds prior to October 31, 1927.

*†$32,175.97 less $2,000 repaid by Warthen on November 3, 1927, which is included in receipts column 2.

‡Includes $2,000 paid by Warthen on November 3, 1927, which was applicable to indebtedness existing on October 31, 1927; but the evidence shows that no part of it was applied to the school, sinking fund, gas tax or dog tax accounts.

¶Includes balance due on taxes June 30, 1927, $331.81, omitted capitation taxes assessed January 1-June 30, 1927, $258.98, omitted capitation taxes assessed July 1-December 31, 1927, $69.77, license taxes assessed July 1-December 31, 1927, $52.00, less claims subsequently allowed for delinquent omitted capitation taxes $44.55.

§Includes $2,349.42 which belonged to other county accounts, but was misapplied to the payment of county sinking fund items.

#This payment came from collection of 1927 tax tickets, but was misapplied by Warthen to the payment of an indebtedness existing prior to October 31, 1927.

●After this opinion was practically completed, we find that t here are small errors in the distribution of this item, and that the distribution should be Schools $1,012.47, County Sinking Fund $81.00; "Other county funds" $1,060.60. But we have not deemed the error of sufficient importance to require that we hold up this opinion to permit a recomputation of the subsequent figures into which these items enter.

Making adjustments to correct for the two misappropriations of funds between accounts, which we have referred to above, exclusive of his liability for uncollected 1927 tax tickets, on January 1, 1928, Warthen's indebtedness to the county and State amounted to $81,402.51, composed of the classes of indebtedness shown in Table 2.

TABLE 2

| COUNTY | Indebtedness Accrued Prior to October 31 | Misappropriations to Personal Uses October 31-December 31, 1927 | Funds Turned Over to Himself January 7, 1928 | TOTAL |
|---|---|---|---|---|
| School Funds | $ 1,399 75 | $13,011 87 | $ 1,002 41 | $15,414 03 |
| County Sinking Fund | 16,167 37 | | 87 95 | 16,255 32 |
| Gas Tax Fund | | 336 04 | | 336 04 |
| Dog Tax Fund | 741 23 | 26 08 | | 767 31 |
| Other county funds | 30,175 97 | 8,370 71 | 1,063 71 | 39,610 39 |
| Reduction in Sinking Fund balance of October 31, 1927, by misapplication to it of funds collected on 1927 tax tickets which belonged to "Other county funds" | 2,349 42 | | | 2,349 42 |
| Total county | $50,833 74 | $21,744 70 | $ 2,154 07 | $74,732 51 |
| State | 668 01 | 5,457 75 | 544 24 | 6,670 00 |
| Total county and State | $51,501 75 | $27,202 45 | $ 2,698 31 | $81,402 51 |

Accepting 29.415 per cent of the 1927 county levies apportioned to each of the several county accounts as the amounts collected January 1-November 9, 1928, from 1927 levies for that account, and including the moneys turned over to himself on January 1, 1928, Warthen received during that period for the account of the county $81,461.57 from the collection of current county revenues, and made disbursements (including his commissions on new funds collected or received during the period) amounting to $79,-

565.95. The distribution of these receipts and disbursements among the school fund, county sinking fund, gas tax fund, dog tax and "other county funds" accounts is given in Table 3.

TABLE 3

| | Receipts From Collections of Current Revenues January 1-November 9, 1928 | Disbursements Including Commissions January 1-November 9, 1928 |
|---|---|---|
| School Funds | $57,671 26 | $53,711 27 |
| County Sinking Fund | 1,035 71 | 207 64 |
| Gas Tax Fund | *7,702 30 | 5,391 37 |
| Dog Tax Fund | 1,889 79 | 2,356 11 |
| Other county funds | *13,065 30 | †17,899 56 |
| Items not distributed by us: | | |
| Collection of penalties on 1927 levies | 97 21 | .................... |
| | $81,461 57 | $‡79,565 95 |

*Adjusted to reflect the transfer of $764.50 from County Fund to Gas Tax Fund.

†Includes $200 in coupons not found until after Warthen's death and not included in audits.

‡Includes commissions to the amount of $1,598.96.

During the period January 1-November 9, 1928, Warthen received for the State from the collection of current revenues, including money turned over to himself, $8,913.94, and made for the State disbursements amounting to $12,669.91. See Table 4 given in footnote 27.

In Table 4 we have treated Warthen as having collected all the 1927 State taxes not allowed him as delinquent. There may be a small amount of State taxes included in the 1927 tax tickets he had on hand at the time of his death; but it causes no substantial prejudice to any one to treat the 1927 uncollected tax tickets as being exclusively for county levies, and we have done so.

TABLE 4—STATE—JANUARY 1-NOVEMBER 9, 1928

| | Receipts | Disburse-ments |
|---|---|---|
| Receipts: | | |
| Amount of State funds turned over to himself by Warthen January 1 | $ 544 24 | |
| Collections of 1927 State capitation, property and income taxes | 2,306 46 | |
| Collection of penalties on above | 140 46 | |
| Collections of 1928 license taxes made January 1-June 26 | 4,131 38 | |
| Collections 1928 State licenses June 27-30 | 1,470 79 | |
| Collections of 1928 license taxes after July 1 | 172 90 | |
| Collections of omitted capitation taxes assessed in 1928 | 113 06 | |
| Collections of delinquent taxes | 34 65 | |
| Remittances to Auditor: | | |
| January 26 for omitted capitation taxes collected June-December, 1927 | | $ 69 77 |
| February 7 for omitted taxes collected January-June 30, 1927 | | 258 98 |
| February 29 (see note *) | | 5,789 56 |
| June 29, applied by Auditor to amount due for 1927 taxes | | 3,000 00 |
| June 29, applied by Auditor to amount due for 1928 license taxes | | 3,500 00 |
| October 8 for 1928 license taxes | | 14 99 |
| October 8 for balance due on 1927 tax collections | | 1 96 |
| October 8 for collections on delinquents | | 34 65 |
| | $8,913 94 | $12,669 91 |

*As the Auditor had applied the remittance of $331.81 of December 16 to taxes collected prior to October 31, 1927, he applied the whole of this item to payment of collections on 1927 tax tickets.

From Tables 3 and 4 it appears that the money actually received by Warthen during the period January 1-November 9, 1928, from current revenues for all county accounts was $1,895.62 more than his disbursements for the county during that period, and that his remittances during that period to the State Treasurer exceeded his receipts of State money from current revenues by $3,755.97.

Comparing the balances due by Warthen to the several county funds on January 1, 1927, exclusive of his liability for uncollected 1927 tax tickets and also exclusive of the money turned over to himself January 1, 1927, for the several county funds, with the total balances due by him to

the county on November 9, 1928, it is seen that the net increase of his indebtedness to the county January 1-November 9, 1928, was $8,862.20, as is shown in Table 5.

TABLE 5

| | Balances Due November 9, 1928 | Balances Due January 1, 1928, Exclusive of Uncollected 1927 Tax Tickets and Moneys Turned Over to Self | Increase or Decrease in Balances (Decrease Shown by Minus Sign) |
|---|---|---|---|
| School Fund.................... | $ 21,643 79 | $14,411 62 | $ 7,232 17 |
| County Sinking Fund..... | *17,257 40 | *16,167 37 | 1,090 03 |
| Gas Tax Fund................ | 2,646 97 | 336 04 | 2,310 93 |
| Dog Tax Fund............... | 299 51 | 767 31 | —467 80 |
| "Other county funds" | 39,694 47 | 40,896 10 | —1,201 63 |
| | $81,542 14 | $72,578 44 | $ 8,963 70 |
| Less coupons paid but not included in audit | 200 00 | .......................................... | 200 00 |
| | $81,342 14 | .......................................... | $ 8,763 70 |

*Decreased to this figure by misapplication October 31-December 31, 1927, of funds belonging to other accounts to redemption of bonds chargeable against the county sinking fund.

This increase was made up of the following items:

Aggregate misappropriations of collections from current revenues..$ 1,895 72

Liability for uncollected 1927 tax tickets ($7,191.68) less commissions thereon ($323.60)........................................................................ 6,868 08

$ 8,765 80

But this is not the whole story with reference to Warthen's transactions from January 1-November 9, 1928.

He entered on his day book on February 4th and 25th collections on 1926 and 1925 tax tickets amounting to $98.50. He should be charged with this amount during the period January 1-November 9, 1928, and it should be credited toward reducing his indebtedness accrued prior to October 31, 1927.

No other inference can be drawn from the evidence than that during this period Warthen made large misappropriations of both State and county moneys for his personal uses,

as well as large misapplications of official funds among the several county and State funds. His heaviest misappropriations in 1928 would seem to have been made between January 1st and June 15th. On the other hand, the evidence shows that he made some large payments to himself as treasurer from funds procured by him from personal sources.

At least $4,325.00, and probably $6,325.00, of the $6,500 with which the State Treasurer credits Warthen with having remitted on June 29, 1928, was paid from funds received by him from personal sources. The $6,500 check by which this remittance was made was paid on July 3, 1928, by a charge to the account of "A. L. Warthen, Spl." At this time Warthen had two bank accounts, "A. L. Warthen, Treas." and "A. L. Warthen, Spl." From June 27th to September 7, 1928, the balance on deposit to "A. L. Warthen, Treas." remained at $7.51. From June 6th to July 2nd the account "A. L. Warthen, Spl." was at all times overdrawn, and at the opening of business on July 2nd the overdraft was $63.02. On July 2nd-5th Warthen made six deposits to "A. L. Warthen, Spl.": July 2nd, $867.85, $2,000 and $2,180; July 3rd, $2,000 and $733.34; and July 5th, $54.-74, a total of $7,835.93. The deposit slips which are in evidence identify the sources of the following moneys included in these deposits: $325 of the $867.85 deposit was a check sent Warthen by the State Treasurer for his commisisons on the remittance of $6,500. Included in the deposit of $2,180 of July 3rd was a check for $2,000 drawn on Greenwich, Connecticut, which is the home of A. L. Warthen, Jr. The deposit of July 3rd for $2,000 was a check of A. L. Warthen, Jr. The deposit of July 3rd for $733.34 was a check of the State Treasurer remitting State school funds. The deposit of $2,000 on July 2nd is noted on the deposit slip as "currency." The evidence does not positively identify the source of this $2,000, but it is consistent with its having been a temporary loan procured by Warthen in anticipation of the money which he received later that day or the next

day from his son A. L. Warthen, Jr. In this connection it may be noted that on July 5th there is a charge against this account for $2,000, which the evidence shows cannot reasonably be held to be a payment for the county or State. The other moneys deposited July 2nd-5th are not positively identified by the evidence, but the fair inference is that they were moneys received from the collection of 1928 State license taxes.

From this it appears that at this time Warthen paid to the State out of funds received from personal resources a sum in excess of the amount by which his remittances to the State during the period January 1-November 9, 1928, exceeeded his collections for the account of the State. It further requires the inference that he had used the State funds which were thus replaced for either his own personal uses or applied them to the payment of county warrants.

The evidence also establishes that on or about June 27, 1928, Warthen paid to himself as treasurer for the county $10,000 which he raised by a deed of trust given by his wife on her residence property in Front Royal.

From January 1st until May 7, 1928, Warthen had only one bank account. This account was overdrawn from April 11th to May 7th, at which time the overdraft had increased to $2,592.04. It is not possible to determine from the evidence what was the total amount of collections which Warthen made for the county and State during the period April 11th-May 6th, because after March 2nd he made no entry on his day book of collections made. But the record does show that during this period he received for the county from donations, sales of property and remittances from the State Treasurer sums aggregating $1,634.72, all of which would seem to have been deposited to this account.

On May 7th Warthen opened a new account, "A. L. Warthen, Treas." with a deposit of $73.06, and on the same day the account "A. L. Warthen" was closed (for all time) by the transfer of the overdraft of $2,592.04 to this new account. During the period May 7th-June 26th he deposited

only $185.64 to this account, and on June 26th the overdraft was $2,452.46.

On June 26th Warthen received a check on a Philadelphia bank for $10,000 which was deposited on June 27th to "A. L. Warthen, Treas." On June 30, 1928, there was admitted to record a deed of trust dated June 23, 1928, from Anna H. Warthen and Arthur L. Warthen, her husband, to Robert L. Montgomery, trustee, conveying Anna H. Warthen's residence property in Front Royal to secure a note for $10,000. The fair inference is that the deposit of June 27th was a deposit of the proceeds of this loan.

On June 27, 1928, county warrants aggregating $7,530.03 were charged against the account "A. L. Warthen, Spl." The debit slip for the charge reads "Co. warrants $7,530.03." It does not list the several items included in the charge, and the evidence does not show what they were. The fair inference from the record is that the whole of the $2,452.46 overdraft was incurred by the charges to this account of county warrants, and that the whole of this $10,000 loan was applied to the discharge of this overdraft and the payment of county warrants charged against it on and after June 27th. This constituted a payment by Warthen to himself as treasurer of this amount from personal funds for the account of the county. Not only was it deposited to his account as treasurer, but it was through the medium of such deposit applied to the payment of county warrants.

He should, and will, be charged with having received this amount of cash for the account of the county in addition to cash received from the collection of county revenues. The question is, To the payment of what part or parts of his then indebtedness to the county should it be applied?

In the audit Warthen is credited with having paid out of the gas tax funds a warrant of April 27, 1928, for $1,000 to the Bank of Warren, and there was a school warrant for $1,000 issued on April 27, 1928, to Motley Construction Company. On May 3rd an item of $1,000 is charged against

the account "A. L. Warthen, Treas." This is the only $1,000 charged as an individual item against any of Warthen's accounts from April 27th, until October 15th. It is reasonable to infer that this charge was either for payment of the school warrant or the gas tax fund payment of April 27th, and that the other $1,000 item was included in the $7,530.03 of warrants charged up *en masse* on June 27th. On May 1st the interest coupons on a number of county bonds fell due. Warthen is credited with having paid at some time on or after May 1, 1928, $2,253.75 of such coupons, all which were chargeable to the Cedarville, South River and Front Royal district sinking funds, accounts which are entirely different accounts from the county sinking fund. There are charges to this bank account on May 2nd aggregating $675 which, from their amounts, may be, and probably were, payments of such coupons. The total amounts of the county warrants, *other than school warrants,* issued during April and the period May-June 30, 1928, which were at any time paid by Warthen are as follows: April, $2,210.80; May 1st-June 30th, $2,318.53.[28] The school warrants charged against the county school fund, which were issued during May and June, 1928, which were paid by Warthen at any time, were as follows—issued in May, $1,771.15, issued in June, $10,246.22. As near as we can ascertain, the total amount of school warrants issued May 1-June 30, 1928, which were paid at any time by Warthen and charged to the fund designated State school fund amounted to $5,819.99. On May 23rd Warthen opened the account "A. L. Warthen, Spl.," and during the period May 23rd-June 30th, the charges against this account amounted to $17,263.02. A large number of the charges going to make up this last item can be identified as being for the payment of school warrants. During the period May 23-June 4, 1928, at least $3,386.55 of school warrants can be identified as having been paid by charges against this account. The payment of these items contributed to creating an overdraft of this account

---

[28] This figure does not include any interest coupons.

amounting to $914.16 on June 4th. During the period June 5th-June 9th, Warthen deposited to this account $10,738.17 which was money borrowed by the school board and placed in his hands to enable him to pay school warrants. All this money was checked out prior to June 26th. He also deposited on June 30th, $307.60 which came from the same source, and checked it out the same day. The reasonable inference is that this $10,738.17 and $307.60, totaling $11,045.77, was applied to the payment of school warrants. Further, the audit of October 27, 1928, shows that the total amount of school warrants paid by Warthen October 31, 1927-June 30, 1928, was $41,614.80, of which, as has been shown, $16,-709.92 was paid prior to January 1, 1928, leaving $24,904.88 which was paid January 1st-June 30th.

The facts above stated are not sufficient to establish with exactness the part of the deposit of $10,000 of June 27th which was applied to the payment of school warrants and the part applied to the payment of other county warrants. But it does show that any application thereof which disregards the fact that a part of it was applied to both classes of warrants does violence to the facts proven. In such a situation, in a case such as this, when exact justice can not be done, substantial justice, as near as may be, must be done. Upon a consideration of all the evidence the following application of this $10,000 would appear to be approximately in accord with the actual application thereof made by Warthen, and we shall treat it as the application thereof made by him—that is, to payment of school warrants issued during May and June $3,405, to payment of school warrants issued during April $1,000, to payment of warrants drawn on the gas tax fund $1,000, to payment of coupons or warrants payable out of the county sinking fund $165, and to payment of warrants drawn on and interest coupons payable out of other county funds $4,430.

 There is no evidence to show to what part of his indebtedness to each of these funds Warthen applied the payments therefor which he made from this $10,000. This

being true, the payments made for each fund should and will be applied to that part of his indebtedness to that fund which first accrued, or is the least secured. This application of it results in applying the payments for all funds, or accounts, other than the school accounts, to his indebtedness accrued prior to October 31, 1927. In the case of the school accounts, $1,399.75 is applicable to his indebtedness which accrued prior to October 31, 1927, and the residue, $3,005.25, to the repayment of his defalcations during the period October 31-December 31, 1927.

There may have been other payments made by Warthen from personal funds and other collections made by him on tax tickets for 1926 and prior years for which he had not settled, but if so, the evidence is insufficient to establish the fact. And in the light of the evidence no presumption of payments out of personal funds after January 1, 1928, can properly be indulged where the evidence does not establish that such payments were made.

We have examined with care the evidence bearing upon whether Warthen misappropriated the $10,000 of school funds which he received from the State Treasurer on or about October 2, 1928, and find that with the exception of $110.14, the evidence fails to establish any misappropriation thereof to personal uses.

Only two deposits were made to the account "A. L. Warthen, Treas." after June 27, 1928, and on October 2nd the amount to the credit of this account was $6.71. On October 3rd, $10,000 was deposited. This was the remittance of school funds from the State Treasurer. On October 15th, $889.86 was deposited. This was a remittance of gas tax money from the State Treasurer. The record affirmatively shows that a large part of the $10,000 deposit was used to pay school warrants. But on October 15th an item of $1,000 was charged to this account, and on October 16th another item of $1,000. Only one of these $1,000 items can reasonably be accounted for as a payment for the account of either the county or the State; and the inference

is almost inescapable that at this time Warthen misappropriated for personal uses the whole of the gas tax deposit of $889.86 and $110.14 of the $10,000 of school money. With this exception the record warrants the inference that all of the $10,000 deposit of October 3rd was applied to the payment of county warrants, most of them school warrants.

There is also evidence tending to show that he misappropriated the gas tax remittance of $831.95 made to him on or about September 9, 1928; but in most instances it is not possible to point out the specific moneys misappropriated by him after January 1st.

Applying the principles and facts heretofore stated, we find as follows:

(1) The evidence is not sufficient to show that any part of Warthen's indebtedness to the county existing on November 9, 1928, accrued prior to December 31, 1923. In this respect the decree appealed from is affirmed.

(2) Disregarding interest, of Warthen's indebtedness to the county existing on November 9, 1928, $43,740.49 accrued during the period January 1, 1924-October 31, 1927. This amount is made up as follows:

Balance due county October 31, 1927, as per audit of October 24, 1927......................................................................................................$53,833 74
Less credits:
 Adjustment of $1,000 to give him credit for that amount paid prior to October 24, 1927, on redemption of county bonds................................................$ 1,000 00
 Amount repaid by Warthen from personal sources November 3, 1927...................................................... 2,000 00
 Aggregate amount applicable as a credit from the payment of June 27, 1928, from personal funds............ 6,994 75
 Amount collected on 1926 and 1925 tax tickets in February, 1928....................................................... 98 50
 10,093 25

 $43,740 49

All of the indebtedness accrued prior to October 31, 1927, was in fact due and payable by Warthen at least as early as October 1, 1927, and in computing the amount thereof at any time interest at six per centum per annum from that date should be included.

After Warthen's death $2,286.41 was collected on tax

tickets for 1926 and prior years, which amount was paid to the county on April 22, 1930, and should be credited as of April 22, 1930, on that part of his indebtedness accrued prior to October 31, 1927. After allowing all the credits above mentioned, the principal amount of Warthen's indebtedness accrued prior to October 31, 1927, is in excess of the amount of the penalty ($43,000) of his official bond for his term January 1, 1924-December 31, 1927, on which The Aetna Casualty and Surety Company is surety.

The trial court decreed that The Aetna Casualty and Surety Company should pay to the county the penalty of its bond, $43,000, with interest at six per centum per annum from October 13, 1927, subject to a credit of $17,121.74 paid by it to the county on February 18, 1931, on account of its liability on this bond. The general contention of The Aetna Casualty and Surety Company, that the court erred in decreeing that it should pay not only the penalty of its bond but interest thereon, is not well taken. See *McMullen* v. *Winfield Building & Loan Ass'n,* 64 Kan. 298, 67 Pac. 892, 56 L. R. A. 924, 91 Am. St. Rep. 236; note 55 L. R. A. 381; 9 C. J. p. 132, section 244; 4 R. C. L. p. 69, section 35. But under the facts and circumstances of this case it would have been inequitable to have required The Aetna Casualty and Surety Company to pay this money into Warthen's hands as treasurer until he had given a new bond to protect it against having to pay it again should he misappropriate it as he had done some, at least, of the money which had theretofore come into his hands. While the supersedeas bond rendered the sureties thereon primarily liable as sureties for the payment of Warthen's defalcations after October 31, it still left The Aetna Casualty and Surety Company secondarily liable for any defalcations he made October 31-December 31, 1927; and it was not until January 1, 1928, that The Aetna Casualty and Surety Company could pay to the county treasurer the amount of his defalcations prior to October 31, 1927, without still being liable for his misappropriation thereof if it should occur. We are of opinion that the decree of the

trial court against The Aetna Casualty and Surety Company should be modified to require it to pay to the county $43,000 with interest at six per centum per annum from January 1, 1928, subject to a credit of $17,121.74 as of February 18, 1931.

(3) Warthen's misappropriation of county funds during the period October 31-December 31, 1927, which remained unpaid on November 9, 1928, was $21,744.70 with interest at six per cent per annum from January 1, 1928, subject to a credit of $3,005.25 as of June 27, 1928. For this amount the sureties on Warthen's supersedeas bond are liable as sureties. The Aetna Casualty and Surety Company is also bound under its bond for the payment of this part of Warthen's indebtedness, but as between it and the sureties on the supersedeas bond the sureties on his supersedeas bond are primarily liable and The Aetna Casualty and Surety Company is secondarily liable; but as the penalty of the bond of The Aetna Casualty and Surety Company has been exhausted in the amount decreed against it for indebtedness accrued prior to October 31, 1927, no decree should be entered against it on account of Warthen's liability accrued October 31-December 31, 1927.

(4) The liability of Warthen to the county as of November 9, 1928, which is properly considered as having accrued during the period January 1-November 9, 1928, was $18,862.20 computed as follows:

| | | |
|---|--:|--:|
| County moneys turned over to himself on January 1, 1928 | $ 2,154 | 07 |
| Collections during period from current revenues | 79,307 | 50 |
| | $81,461 | 57 |
| Amount collected on 1926 and 1925 tax tickets | 98 | 50 |
| Amount paid to himself as treasurer from personal funds June 27, 1928 | 10,000 | 00 |
| | $91,560 | 07 |
| Liability for uncollected tax tickets | 7,191 | 68 |
| | $98,751 | 75 |

Less credits:
Disbursements for account of county during period
(including commissions on sums received for it)....$79,565 95
Commissions on uncollected 1927 tax tickets............... 323 60
——————— 79,889 55

Balance........................................................................................$18,862 20

$4,096.16 was collected after Warthen's death on 1927 tax tickets, which amount was paid to the county on April 22, 1930. This amount and any further collections on 1927 tax tickets should be applied to his indebtedness accrued January 1-November 9, 1928. Also after Warthen's death $200 which Warthen had on hand at the time of his death was paid to the county by his personal representatives, which we shall credit as of November 9, 1928, on the portion of his indebtedness accruing after January 1, 1928. Interest on that part of Warthen's indebtedness which accrued January 1st-November 9th, should bear interest at six per centum per annum from November 12, 1928. After allowing the credit above mentioned, the amount due by Warthen's estate on February 18, 1931, on account of the part of his indebtedness which originally accrued on or after January 1, 1928, was $16,976.38.

For this amount National Surety Company was liable as surety on Warthen's official bond for his term of office beginning January 1, 1928. Any further liability of National Surety Company on its bond was a liability secondary to the liability of either the surety on his official bond for the term ending December 31, 1927, and/or of the sureties on his supersedeas bond; and arose from the use of current collections and receipts to hide defalcations made prior to January 1, 1928, or out of Warthen's failure to collect from himself, or the surety on his official bond for his prior term, items of indebtedness existing on December 31, 1927.

On February 18, 1931, the National Surety Company paid to the county $23,991.90 under the terms and conditions set forth in that part of the decree of February 18, 1931, quoted in the footnote.[29] This payment exceeded

---

[29] "At the close of argument by counsel for The Aetna Casualty and Surety Company, counsel for the National Surety Company, stated in open court that said National Surety Company was and had been ready and willing to pay to the county of Warren any liability clearly established to be due by it; that the complicated and involved state of the accounts of A. L. Warthen, late treasurer of said county, and the lack of proper book accounts to enable it to determine with any

by $7,015.52 the sum for which the National Surety Company was liable as the primary surety. After the county shall have recovered from Warthen's estate or The Aetna Casualty and Surety Company and the sureties on the supersedeas bond the full unpaid portion of Warthen's indebtedness to it, except $7,015.52 with interest from February 18, 1931, National Surety Company is entitled to be subrogated to all the remaining rights of the county against The Aetna Casualty and Surety Company and the sureties on the supersedeas bond.

▆▆▆ The county contends that the decree appealed from was erroneous in that it did not provide that the National Surety Company should pay to the county the penalties provided by sections 361-364 of the Tax Code. Under the facts and circumstances of this case the court did not

degree of accuracy or certainty when and what amounts the said Warthen had misappropriated funds of the said county for which it or other sureties might or could be held responsible, rendered it impossible to ascertain what, if any, amounts it would be liable for, but that, in the light of the report of the special commissioner, the National Surety Company had concluded that it was liable to the county of Warren in the sum of $11,534.63, representing the balance ascertained by the commissioner's report to be due to the county of Warren and designated in said report as the "State School Fund," and that it might be held liable for an additional sum in the amount of $9,591.20, thereupon the National Surety Company tendered to the county of Warren its two drafts as follows: One in the sum of $13,-099.48, representing payment of the State School Fund balance above mentioned of $11,534.63, with interest thereon from November 15, 1928, to this date, and the other in the sum of $10,892.42, representing the item above mentioned in the principal sum of $9,591.20 with interest thereon from November 15, 1928, to this date—both of said drafts being drawn payable to the order of Marvin A. Trout, clerk of Circuit Court, Warren county, Virginia, and the county of Warren thereupon accepted said drafts aggregating $23,991.90, of which $13,099.48 is in payment of the State School Fund balance above referred to, and $10,892.42 is to be credited upon any other liability that may be finally established in this case against said National Surety Company, without prejudice to the county of Warren to pursue it for further liability herein as to said State School Fund or otherwise, and likewise without prejudice to the rights of said National Surety Company to pursue whatever right, claim or demand it may have over against any other bond or bonds, or the sureties thereon, that were given by the said A. L. Warthen, as treasurer of said county of Warren or otherwise prior to the date of the execution and delivery of his said bond on which the National Surety Company was surety."

err in refusing to impose the severe penalties provided by those sections. *Clevinger* v. *County School Board,* 139 Va. 444, 124 S. E. 440.

The several provisions of the decree appealed from will be affirmed, modified or reversed as below stated:

(1) So much of the decree as relates to the liability of The Aetna Casualty and Surety Company will be modified to decree that this company shall pay to the county of Warren $43,000 with interest at six per centum per annum from January 1, 1928, subject to a credit of $17,-121.74 as of February 18, 1931; and as so modified will be affirmed.

(2) So much of the decree as relates to the liability of the sureties on the supersedeas bond given by Warthen, will be reversed; and as to them the cause will be remanded to the trial court for the entry of a decree against them and further proceedings to be had not in conflict with the views herein expressed.

(3) So much of the decree as relates to the liability of National Surety Company will be reversed; and as to it the cause will be remanded for further proceedings to be had not in conflict with the views herein expressed.

(4) As to all other matters adjudicated in the decree appealed from the decree will be affirmed and the cause remanded for further proceedings to be had not in conflict with the views herein expressed.

Costs in this court will be awarded against the appellant.

*Affirmed in part; modified in part; reversed in part.*

HUDGINS and GREGORY, JJ., concur in conclusions.